846 So.2d 715 (2003)
STATE of Louisiana
v.
Donald BROWN.
No. 2002-K-1922.
Supreme Court of Louisiana.
May 20, 2003.
*716 Richard P. Ieyoub, Atty. Gen., Don M. Burkett, Dist. Atty., Richard Z. Johnson, Jr., Mansfield, for Applicant.
Peggy J. Sullivan, Monroe, for Respondent.
TRAYLOR, J.
Donald Brown was indicted by a grand jury for the first degree murder of Kathryn Rankin in violation of La. R.S. 14:30. After a bench trial, defendant was found guilty of manslaughter, a violation of La. R.S. 14:31, and was sentenced to serve twenty years at hard labor, with credit for time served. The court of appeal reversed defendant's conviction and sentence. State v. Brown, XXXX-XXXXX(La. App. 2 Cir. 6/12/02), 825 So.2d 596. Upon the state's application, we granted certiorari to review the correctness of that decision. For the reasons that follow, we reverse the court of appeal, reinstate defendant's conviction, and remand the case to the court of appeal for consideration of defendant's remaining assignment of error.

FACTS AND PROCEDURAL HISTORY
On January 13, 2000, a grand jury indicted defendant for first degree murder of Kathryn Rankin. Defendant waived his right to a jury and received a bench trial. At trial, various witnesses outlined the activities and whereabouts of the victim on the night of April 5, 1999 and early morning *717 hours of April 6, 1999, the last time she was seen alive.
Tony Pratt testified that on that evening after work, he went to a pool hall, arriving at approximately 7:00 p.m. or 8:00 p.m. He noticed the victim arrive at the pool hall between approximately 8:30 p.m. and 10:00 p.m. At the victim's request, Pratt drove her to a liquor store before it closed at either 11 p.m. or midnight. After a brief stop at the home of the victim's mother, they returned to the pool hall. Pratt estimated that the pool hall closed for the night at 11:30 p.m. or midnight. They stayed at the pool hall for approximately forty-five minutes and then Pratt drove the victim and Harold Anderson to Anderson's house.
Harold Anderson testified that on the night of April 5, 1999, he encountered the victim outside the pool hall and agreed to pay her $20 for sex. Pratt drove Harold Anderson and the victim to the house he shared with his brother, Hewitt, and dropped them off. At his residence, Harold Anderson and the victim engaged in sexual activity for approximately 30 or 35 minutes, after which he fell asleep.
Hewitt Anderson testified that he was home in bed when his brother came home with the victim. She later left the residence alone but he was not sure of the time. However, when earlier questioned by the police, he indicated that the victim had left the residence between midnight and 12:30 a.m. However, he stated that he did not did not have a clock.
Garrison Simpson testified that he left his girlfriend's house at approximately 11:00 p.m. on April 5, 1999, and drove through an area close to where the victim's body was found. While he waited at a stop sign, he saw defendant and the victim emerge from behind a tree. Defendant was holding the victim from behind and the two were "tussling." The victim was crying and asked Simpson to drive her home. Simpson drove away, but then backed up and told defendant to "leave her alone." Defendant responded that he would "take care of the girl." Simpson observed the two for approximately five minutes and, concluding that the matter was nothing more than a lovers' quarrel, he did not intervene. He claimed that the area where he observed defendant and the victim engaged in the altercation was approximately 50 yards from where her body was ultimately discovered. On the following Thursday, Simpson encountered defendant in a liquor store but defendant refused to speak to him. Simpson did not tell the authorities about his encounter with defendant and the victim until they questioned him in December of 1999. However, he told others in the community about what he had observed upon learning of the victim's death. Simpson first indicated at trial that he learned of the victim's death the day after he saw her fighting with defendant. Later, however, he stated that he was unsure about whether he learned of the victim's death the following day or two days after her altercation with defendant.
Clarence Gillard, Jr., discovered the victim's body at approximately 11:00 a.m. on April 7, 1999, approximately 36 hours after she was last seen alive. The victim's body was on a wooded trail used as a shortcut to the housing projects.
In January of 2000, defendant was apprehended in Virginia. Initially, defendant denied knowing the victim but on January 6, 2000, agreed to give a statement to the Desoto Parish investigating officers about his encounter with the victim on April 5, 1999. Defendant was Mirandized and told police that he was on the trail with the victim on the night of April 5, 1999, but denied killing her. He claimed that when he and the victim met that night, she had two rocks of crack cocaine. They smoked *718 the crack cocaine at his sister's house, which was located in the projects adjacent to the murder scene. He estimated that he left the house at 5:00 a.m. with his sister and the victim. Defendant stated that he purchased more crack cocaine and his sister went home. Defendant and the victim then went to the trail and smoked his newly-purchased crack cocaine in exchange for sex. As the victim pulled down her pants, she tried to steal defendant's billfold from his pants. Defendant slapped her across the face with his open hand, retrieved the billfold, and ran away in the same direction they had used to enter the trail. Defendant claimed that the victim followed him, shouting, "I'm gonna get you!" Defendant insisted that the victim was alive when he left her.
Defendant further stated that, earlier in the evening, the victim had beaten a man with a bottle and stole $20 from him. According to defendant, this individual had threatened the victim. When defendant emerged from the trail after his altercation with the victim, he saw the other man on the corner. In explaining the victim's death, defendant suggested that either the victim had died accidentally by falling on tree stumps on the wet trail or that the man she had taken money from earlier had murdered her.
Defendant also denied seeing Simpson that night. He claimed that after he left the trail, he went to his sister's house. The next morning, he went to the house of his girlfriend, Bertha Jewitt. Later that day, someone telephoned Jewitt and told her that the victim's body had been discovered. Defendant attended the victim's funeral and moved to Virginia two weeks later for a job. After he left Louisiana, defendant's aunt told him that people began to say that he had killed the victim.
Jewitt testified that defendant came to her house around midnight or 1:00 a.m. on April 6, 1999. Although the body was not discovered until the following day, Jewitt testified that at 9:30 a.m., defendant told her that the victim was dead. Jewitt stated that after defendant told her about the victim's death, they did not discuss the matter further. However, Jewitt's testimony demonstrating defendant's guilty knowledge differed from the story she originally told police. When questioned by officers during their investigation of the crime, Jewitt corroborated defendant's story, stating that she learned about the victim's death when a friend had telephoned and told her about it.
Horace Womack of the DeSoto Parish Sheriff's Office testified that various items of clothing were found in the area where the victim's body was discovered but that none of the articles linked anyone to the crime scene. He indicated that the waterline suggested that the victim's head had at some point been completely submerged in water.
Robert Davidson, another officer employed by the DeSoto Parish Sheriff's Office, aided in the investigation. He testified that on April 7, 1999, the victim's body was found face down in a small creek and she was wearing only a pair of socks. Based on their investigation, law enforcement officers located defendant in Virginia. After they questioned defendant, he was arrested and transported back to Louisiana.
Sergeant Gary Hobbs of the Mansfield Police Department was the lead detective in the investigation of the crime and stated that the body was found on a well-traveled trail. However, the trail floods in wet weather and it had been raining around the time of the offense. The officer explained that "[w]hen it rains, that area floods and that trail is not used commonly, `cause it stays two to three inches deep in water for several days...." Accordingly, *719 it was not unusual that the body had not been discovered earlier. The investigation revealed that no one had seen the victim alive after the night of April 5, 1999.
Steven Cogswell, a forensic pathologist, performed the autopsy on the victim's body. He concluded that the scrapes on the victim's face, chest, arm and back had been sustained when her body was dragged along the ground. These injuries were inflicted before the victim's death. Cogswell stated that the presence of stones and dirt in the victim's lungs and stomach indicated that she was alive and ingested the materials when her head had been forcibly held underwater.
Cogswell stated that the bruising in the deep muscles of the victim's neck around her voice box and thyroid gland were consistent with strangulation. A contusion and one-half-inch laceration was observed on her anus, indicating she had been forcibly penetrated by some object. Given the degree of the injury, Cogswell opined that the intercourse had not been consensual. No semen was detected in swabs of her mouth, rectum, and vagina. He concluded that the victim's death had been caused by a combination of drowning and strangulation.
At the close of the state's case, defendant moved for a directed verdict, an option open to him as the result of electing a bench trial. See La.C.Cr.P. art. 778. The court acknowledged "gaps in the information available to show what happened that night" but ultimately denied the motion.
The defense presented its case through the testimony of pathologist Gerald Edward Liuzza. The witness reviewed the autopsy report prepared by Cogswell and concluded that drowning and blunt force injuries may have caused the victim's death but that these findings did not foreclose other possible causes. He stated that no time of death could be established, and because the victim's body had been submerged in water, such a determination would be difficult. He claimed that although the victim may have drowned, he had observed other cases in which a dead body had been immersed in moving water which resulted in the deposit of debris in the mouth and lungs. Liuzza recognized that the victim's neck had bruises suggesting she had been grabbed by a hand but noted that there were no finger imprints or nail marks.
Given the large quantity of cocaine and alcohol in the victim's system, Liuzza testified that there was a great risk for a drug reaction and the possibilities of a seizure or drug overdose could not be excluded as causes of death. Ultimately, the witness concluded that there was not enough information to determine whether the victim's death was a homicide. Nonetheless, the witness admitted that Dr. Cogswell was in a better position to evaluate the post-mortem findings because he had performed the autopsy. However, he added that he was not disputing those findings but rather offering a different interpretation of them.
The parties waived closing arguments and the court found defendant guilty of manslaughter, ruling as follows:
.... Kathryn Rankin was killed on ... April 5, 1999, on the shortcut trail here in Mansfield from the projects to Johnson Street. She was beaten and dragged. Whether she was forcibly drowned or drowned in an unconscious state, ... can not conclusively be determined. The evidence proves beyond a reasonable doubt however that she died as a result of Donald Brown's actions. Because we can not determine the circumstances surrounding the drowning, the maximum crime that the [d]efendant can be convicted of is manslaughter. I am hereby finding Donald Brown guilty *720 of manslaughter in the death of Kathryn Rankin.
At sentencing, the court expanded on its earlier statements regarding the crime, commenting, "From a legal standpoint, this [c]ourt concludes that drowning was the cause of her death, along with the blunt force injuries." As to defendant's story regarding his encounter with the victim, the court added, "The statements that you made in there I didn't find plausible whereby you indicated that after striking her you turned and ran from the scene and she must have chased after you and fallen and hurt herself, causing her injuries." In explaining his manslaughter verdict, the court stated:
.... We cannot know today what Mr. Brown's intent was then. The facts indicate that there was violence at the time. Whether that violence arose to the level of intentional infliction of death is very possible but the reason I found him guilty of [m]anslaughter instead of second degree murder was because it was impossible to prove beyond a reasonable doubt that he specifically intended her death.
In a split decision, the Second Circuit reversed the conviction. State v. Brown, 35,641 (La.App. 2 Cir. 6/12/02), 825 So.2d 596 (unpub'd). The appellate majority was primarily concerned with the inconsistencies in the various state witnesses' testimony regarding the times at which they had encountered the victim. Given the circumstantial nature of the evidence, the majority concluded that the state failed to prove beyond a reasonable doubt that defendant killed the victim as a rational fact-finder should not have rejected as unreasonable the hypothesis that Simpson saw defendant and the victim "tussling" shortly after 11:00 p.m.; that the victim then made the walk over to the pool hall where she met Pratt and later Anderson; and that she then returned to Anderson's residence and had sex with him, exiting his home at 12:30 a.m., the following morning. That being the case, the majority found that the trial court erred when it concluded that the state proved that defendant was the last person to see the victim alive and had thus necessarily committed the murder. Specifically, the majority found that the state's evidence:
[S]uggests that the defendant could have committed the crime. However, there is no evidence suggesting that the defendant was the only person who could have committed the crime. The fact that the defendant and the victim were involved in an altercation does not make it an unreasonable hypothesis that someone else committed the crime, particularly in light of the fact that the evidence does not establish how or when the drowning occurred. The death could have occurred hours after the defendant's confrontation with the victim.
The majority conceded that perhaps the most damning proof offered by the state was the testimony of defendant's girlfriend, Jewitt, who stated that defendant told her about the victim's death the day after he fought with the victim but before the body had been discovered by the authorities. However, it found that the evidence demonstrating defendant's "guilty knowledge" had been largely undermined by the testimony revealing that Jewitt had originally corroborated defendant's story, telling police that a friend had telephoned and told her about the victim's demise. Ultimately, the majority concluded that the district court erred when it determined that the state proved the element of identity beyond a reasonable doubt and accordingly reversed the conviction.[1]
*721 LAW AND DISCUSSION
When considering a claim of insufficient evidence, an appellate court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime had been proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676, 678 (La. 1984). The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the "fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law." State v. Mussall, 523 So.2d 1305, 1310 (La.1988). Further, when the conviction is based upon circumstantial evidence, La. R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. State v. Camp, 446 So.2d 1207, 1209 (La.1984); State v. Wright, 445 So.2d 1198, 1201 (La.1984). However, La. R.S. 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt standard; it is merely an evidentiary guide for the jury when considering circumstantial evidence. State v. Porretto, 468 So.2d 1142, 1146 (La.1985).
The essential elements of manslaughter are provided in La. R.S. 14:31. Pertinently, the article provides manslaughter is:
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person...
In this case, despite the inconsistencies in the times provided by the witnesses, the state presented constitutionally sufficient evidence to convict defendant of manslaughter. Notably, defendant admitted to committing a battery upon the victim. Furthermore, regarding any inconsistencies in timing of the events as described by witnesses, it appears likely that several of the state witnesses were intoxicated when they encountered the victim on the night she was last seen. Defendant himself stated that he was with the victim and engaged in the altercation with her after 5:00 a.m., well after any other person had seen her alive. Defendant was presumably very intoxicated at the time considering the amount of cocaine he claimed to have smoked. Considering all of the above, it does not seem particularly troublesome that several of the witnesses could not provide certain or accurate information concerning the exact time of their encounters with her.
While defendant claims that Simpson's testimony should not have been deemed credible given the witness's failure to alert the authorities to his observation of defendant and the victim fighting until he was questioned by police nearly nine months after her death, this very passage of time may have accounted for the discrepancy in the eyewitnesses' testimony concerning the exact time it was that they encountered *722 the victim. In fact, Simpson's testimony was corroborated by defendant's statement to the extent that he admitted fighting with the victim on the trail that night.
In addition, defendant's speculation that the victim may have died as a result of a fall was wholly contradicted by Cogswell's testimony concerning the cause and manner of her death. While the defense expert speculated otherwise, the district judge evidently found the coroner's testimony more credible, a reasonable conclusion given that it was Cogswell who performed the autopsy on the victim's body.
As for defendant's statement about the man who the victim had taken 20 dollars from earlier, allegedly seen by defendant after he emerged from the trail with the victim chasing him, and the speculation that this individual may have killed her, other than his self-serving testimony, defendant provided no support for this theory. Moreover, while defendant claimed that this other individual was seen in the vicinity at the time he fought with the victim, he was not seen by Simpson, who lingered at the scene for some time trying to assess the victim's condition. It is notable that the motive defendant provided police for his theory that another man may have killed the victim would equally apply to himself, that is, that she stole money from both men.
It also appears highly implausible that the victim would chase defendant out of the trail when it was he who had allegedly caught her trying to steal his money. As noted above, this portion of defendant's statement wholly conflicted with Simpson's observation of the victim trying to free herself of defendant's clutches.
In this situation, it appears that the court acted rationally when it rejected defendant's testimony that the victim was alive when he left her. State v. Mussall, 523 So.2d 1305 (La.1988). Moreover, the court evidently found credible Jewitt's trial testimony that defendant told her about the victim's death before her body had been discovered. Accepting this sworn testimony and that provided by the coroner that the victim had been murdered, the court could rationally have concluded that defendant killed the victim. Finally, while not conclusive of defendant's guilt, it is relevant that shortly after the murder defendant left the area and moved to Virginia. See State v. Wilkerson, 403 So.2d 652 (La.1981) (evidence of flight, concealment, and attempt to avoid apprehension is relevant and admissible to prove consciousness of guilt from which the factfinder may infer guilt).

Conclusion
In sum, defendant acknowledged being with the victim in close proximity to where her body was discovered. Defendant admitted striking the victim (albeit with an open hand) when he caught her trying to steal his money. An eyewitness observed defendant forcibly restraining the crying victim who was begging to be released from his grasp. Testimony provided by the coroner demonstrated that the victim had been murdered. Given the circumstances, that the court acted rationally when it concluded that the state proved the elements of manslaughter in this case, in finding that defendant killed the victim, and in determining that defendant failed to present any reasonable hypotheses of innocence. Accordingly, we reverse the court of appeal and reinstate defendant's conviction and sentence as imposed by the trial court. We remand the case to the court of appeal and order it to consider defendant's remaining assignment of error.

DECREE
REVERSED, CONVICTION AND SENTENCE REINSTATED, REMANDED FOR CONSIDERATION OF THE *723 REMAINING ASSIGNMENT OF ERROR.
NOTES
[1] Gaskins, J. dissented and would have affirmed, noting that defendant's explanations for the victim's injuries, specifically that she had fallen and smashed her head on tree stumps or that the individual who she had robbed earlier that day had killed her were wholly implausible. As to the discrepancy in the times, the dissent noted that the witnesses gave only estimates. Finally, the dissent found it highly improbable that the victim would have returned on her own or with another individual to the somewhat remote area where she was last seen with defendant.