910 So.2d 991 (2005)
STATE of Louisiana
v.
Calvin C. COUVILLION.
No. 05-KA-5.
Court of Appeal of Louisiana, Fifth Circuit.
July 26, 2005.
*993 Charles C. Foti, Jr., Attorney General, Julie E. Cullen, Kristen Deason Hagood, Assistant Attorneys General, State of Louisiana, Department of Justice, Baton Rouge, Louisiana, for Appellee, State of Louisiana.
Holli Herrle-Castillo, Louisiana Appellate Project, Marrero, Louisiana, for Appellant, Calvin C. Couvillion.
Panel composed of Judges EDWARD A. DUFRESNE, JR., SUSAN M. CHEHARDY, and WALTER J. ROTHSCHILD.
*994 SUSAN M. CHEHARDY, Judge.
On March 14, 2002, the St. Charles Parish Grand Jury issued a bill of indictment charging defendant, Calvin Couvillion, with second degree murder, in violation of La. R.S. 14:30.1. Brandon Stein and Timothy Prudhomme were charged as co-defendants. Defendant was arraigned on April 3, 2002, and entered a plea of not guilty. The charges against the three defendants were severed and each defendant was to be tried separately.
After the filing of various pretrial motions, Calvin Couvillion's trial commenced on February 9, 2004, and concluded on February 13, 2004. The twelve-person jury returned a responsive verdict of guilty of manslaughter. On May 14, 2004, after denying defendant's motion for new trial and for post-verdict judgment of acquittal, the trial judge sentenced defendant to imprisonment at hard labor for 25 years, to run consecutively to his simple escape sentence. In addition, the trial judge ordered that defendant receive credit for time served and noted that defendant was not eligible for good time and must serve eighty-five percent of his sentence before parole. On May 18, 2004, defendant filed a motion for appeal. Thereafter, defendant filed a motion to reconsider sentence, which was denied on June 2, 2004.

Facts
Dr. Wayne Rogers, a Laplace veterinarian, testified that on Mardi Gras night in 2002, his son, James Rogers ("Jim"), a high school senior, left their house at about 8:00 p.m. to go play video games with his friend, Brandon Stein. When Jim left, he was driving a white Ford Ranger truck. Jim's parents expected him either to telephone them or to return home by midnight. At about 2:00 a.m., Mrs. Rogers awakened Dr. Rogers to tell him their son had not returned home. Dr. Rogers waited until daylight and began to search for Jim. As part of his search, Dr. Rogers paged Brandon Stein several times but did not receive call back. After failing to find Jim, Dr. Rogers telephoned the St. John the Baptist Sheriff's Office at about 1:00 p.m. on February 13, 2002, to report Jim missing.
That afternoon, Dr. Rogers with the help of several of Jim's friends, discovered a telephone number for Brandon Stein's mother. When Dr. Rogers spoke with Stein's mother, she said that Brandon had been babysitting the previous night. When Dr. Rogers spoke with Brandon immediately thereafter, Brandon said that Jim was supposed to meet up with him and his cousin but that Jim never showed up. Dr. Rogers knew there was a discrepancy so he, with the help of Jim's friends, found Brandon. When Dr. Rogers confronted Brandon in person, Brandon told Dr. Rogers another story. After hearing the conflicting stories and observing Brandon's demeanor, Dr. Rogers went to the police department in St. John Parish and relayed Brandon's stories to Major Robert Hay. Dr. Rogers also told Major Hay that Jim was supposed to pick up Timothy Prudhomme, Brandon's cousin, and then go pick up Brandon.
Major Hay testified that, after speaking with Jim's parents at the office, he realized that the truck that Jim had been driving matched the description of an abandoned truck found that day in a vacant lot in St. John Parish. The truck's stereo, CDs, and speakers were gone.
Major Hay testified that, on this same day, February 13, 2002, officers from the St. John Parish Sheriff's Office interviewed Timothy Prudhomme with his mother present. On the following day, officers interviewed Brandon Stein. Because of inconsistencies found in statements given by Brandon and Timothy, Timothy was interviewed again, with his *995 father present, on February 15, 2002. Although this interview began at Timothy's house, the interview stopped when Timothy began to disclose details of Jim's death and then commenced again at the sheriff's office.
At the sheriff's office, Timothy's statement was recorded via audio and videotape. At trial, Timothy's statement was played for the jury. In this statement, Timothy stated that on Mardi Gras night, February 12, 2002, Jim picked him up at about 8:00 p.m. then they picked Brandon up at a friend's house. The three boys then drove to the Time Saver where Brandon bought alcohol for everyone. The three boys then drank alcohol and smoked marijuana on the way to the defendant's apartment.
During this interview, Timothy provided defendant's first name and gave a description of him. In addition, he attempted to give a description of defendant's address. According to Timothy's statement, as Jim was leaving to go to the gas station, Brandon came up from behind him and grabbed him around his neck, dragging him into the room. Timothy stated that he heard noises of a struggle and Jim calling for help while defendant and Brandon were in the room with him. He then watched Brandon and defendant drag Jim's body onto a blanket in the living room and put Jim in the back of the truck with a mattress on top of him. Brandon threw Jim's lifeless body over an overpass.
Timothy stated that they arrived at their grandmother's house between midnight and 1 a.m. on February 13, 2002, and removed the speakers, the CD player, and some CDs out of the truck. Timothy admitted that he took a CD. According to Timothy, Brandon told him earlier that night and one time prior to that night that he was going to kill Jim to rob him.
St. Charles Parish Sheriff's Office was immediately notified of details of Jim's death and the probable location of his body. An arrest warrant was issued for Brandon Stein, who was later arrested.
Lieutenant Rodney Madere, Jr. of the St. Charles Parish Sheriff's Office testified that he was the supervisor of detectives involved in the investigation of Jim's murder. After he received a call from St. John Parish relaying information received from Timothy, detectives started searching overpasses. On Friday afternoon at approximately 5:30 p.m., Jim's body, which was partially wrapped in a blanket, was discovered. A mattress was located near Jim's body.
In the meantime, Timothy was re-located to St. Charles Parish where St. Charles Parish Sheriff's officers interviewed him. In this statement, which was similar to the statement recorded in St. John Parish and was also played for the jury at trial, Timothy recounted that Brandon had talked to him about killing Jim a few times and had told Calvin that he would "get him." Timothy also clarified that defendant did not go with them to the overpass when Brandon disposed of Jim's body and the mattress. Timothy further described defendant and his house. After Timothy concluded his statement, he and his father went with the detectives to locate the house where the incident occurred.
Once defendant's residence was located, the duty judge advised the detectives to secure the residence and then get the search warrant signed. When the officers entered the residence to secure it, four individuals were in the front room: defendant, Traci Caillet, Terrel Gisclair, and Brittney Dufrene. Traci, Terrel and Brittney were interviewed individually. Thereafter, defendant and Traci were brought to *996 St. Charles Parish Sheriff's Office for questioning.
In the early morning hours of February 16, 2002, defendant gave a taped statement to the detectives, which was later played for the jury. In this statement, defendant initially said that Brandon, Timmy and Jim arrived drunk at 8:30 p.m. in a Ford Ranger truck. He stated that he was moving and they used Jim's truck to move things. He stated that he stopped the three boys from leaving because they were drunk. He told them they could stay at the house until they were sober. He stated that he and his friend, Terrel, then went to Bourbon Street at about 10:30 p.m. and got back around 2:45 or 3:00 a.m., and the three boys were gone. He stated that, when he arrived home, his back door was wide open and his mattress was missing.
In the same statement, defendant later admitted that Brandon had told him by telephone before Mardi Gras day that he needed money and knew a guy who had money with a nice sound system in his truck. Brandon asked defendant about getting a gun. He assumed Brandon wanted to kill somebody and take their sound system and money, although Brandon did not say who he would kill or when he would do it.
Later in the interview, Calvin admitted that he did not go to Bourbon Street. He was adamant that he had never met Jim before that night. He further stated that around midnight Jim said he was ready to go home. He explained that, when Jim got up to leave, Brandon went behind him, put a belt around Jim's neck, and pulled Jim backwards towards the back door of the house. Calvin then stated that, while Brandon was pulling Jim back, Jim accidentally hit Calvin so Calvin, out of reflex, hit Jim several times. He stated that, when he hit Jim, blood "gushed out" of his nose. He said he told Brandon to stop, but Brandon pulled Jim into the back room. Defendant stated that Brandon checked Jim's heart and said he was dead. Brandon then told Calvin that Jim was "the guy he was talking about." Brandon wrapped Jim's body in a blanket. He stated that they threw Jim's body in the truck with a mattress on top of it and they dropped Calvin off at his old apartment.
On February 15, 2002, the St. Charles Parish Sheriff's office("SCPSO") executed a search warrant on defendant's house, which yielded a box spring that matched the mattress found near Jim's body. St. John the Baptist Parish Sheriff's Office("SJBPSO") executed another search warrant at the residence of Brandon's relative in Laplace and yielded a set of keys. SJBPSO also recovered a stereo and speakers at Brandon and Timothy's grandmother's residence in Laplace. Dr. Rogers identified the keys as Jim's and the stereo and speakers as those from Jim's truck.
At trial, Timothy testified that Brandon called him and told him Jim was going to pick him up. Timothy stated that he had no idea anything unusual was going to happen. He testified that Jim picked him up between 7:00 p.m. and 8:00 p.m., then they picked up Brandon, and then they went to the Time Saver in Laplace to purchase alcohol. On the way to the defendant's apartment, they were drinking and smoking marijuana.
According to Timothy, the three were using Jim's truck to help defendant move furniture from his apartment to his new house. Timothy testified that before this night, defendant had never met Jim. Timothy stated that once they arrived at defendant's new house, the three continued to drink and he and Brandon started to roll some joints. However, defendant was not drinking. Along with Jim and defendant, Timothy played video games. At one *997 point, defendant and Jim went back to his old apartment to get more things while Timothy played video games and Brandon snorted cocaine.
Timothy testified that Jim got up from the futon and started walking to the front door to go to the gas station to call his parents to let them know he was going to be late. At this time, Brandon grabbed Jim from the back in a headlock and as Jim was struggling, he dragged him backwards toward the kitchen area of the room. Timothy testified that he and defendant did not do anything to stop Brandon. Instead, he testified that defendant helped Brandon. Defendant was hitting Jim as Brandon dragged him into the kitchen area. He further testified that Jim said to stop, that he could not breathe and was struggling, but they dragged him into another room in the back of the house. Timothy stayed on the futon and did not see what was going on in the back room, but testified that they remained in there for ten to fifteen minutes. Thereafter, Brandon wrapped Jim's body in a blanket and drove Jim's truck around to the back door. Brandon and defendant moved the body to the back door. The three placed Jim's body in the back of his truck, and Timothy and defendant placed a mattress in the truck on top of him.
With Brandon driving Jim's truck and Timothy as a passenger, the two dropped defendant off and headed to Laplace. Timothy testified that at no time did he observe a sign of life coming from Jim and believed he was dead. While on the overpass, Brandon got out of the truck and threw Jim's body over the railing. After getting back in the truck, Brandon came up with a story to tell the police, that is, that Jim dropped them off at the Time Saver and he and Timothy walked to WalMart to call one of his friends that picked them up there.[1] Between midnight and 1 a.m., the two arrived at their grandmother's house where they removed speakers, a CD player, and CDs from Jim's truck. Timothy took one CD. Thereafter, Brandon dropped Timothy off at his house.
At trial, Timothy testified that, a week before this incident, Brandon told him that Brandon was going to kill Jim and take his truck. Timothy testified that he believed Brandon was joking when he stated that he was going to "get Jim." On cross examination, Timothy stated that he did not initially tell the police he saw defendant hitting Jim because he was afraid and defendant just had a baby. Also on cross examination, defendant's attorney questioned Timothy about apparent discrepancies in his trial testimony and a previous statement regarding who put the body in the truck and who put the mattress on top of the body in the truck.
At trial, Terrel Gisclair admitted that, on Friday, February 15, 2002, he told the St. Charles Parish Sheriff's officers that he and defendant went to Bourbon Street on the night of the murder to provide an alibi for defendant. Gisclair told the police the truth the following Monday and was arrested for accessory after the fact of second degree murder.
Brittney Dufrene, Terrel's girlfriend, testified that defendant asked her to tell the cops he was on Bourbon Street on Mardi Gras night and to lie about his whereabouts. She was told he had gotten into a fight. She later told the truth.
Traci Caillet, defendant's fiancée and mother of his two children, testified that defendant called her and told her they *998 were playing a game and Jim said he was ready to go and Brandon attacked him. He told her Brandon dragged him to the kitchen area and Jim elbowed defendant in the jaw. She admitted to initially lying to the police at defendant's house. Traci was also arrested and charged with accessory after the fact.
Defendant testified that at the time of the incident he was engaged to Traci and they had one child together and another on the way. They planned to marry on August 23, 2002. Defendant stated, while in jail awaiting trial on these charges, he was convicted of simple escape. He admitted he had Traci, Brittney and Terrel lie for him to give him an alibi. Although defendant had a cell phone in his pocket that night, it did not cross his mind to call for help. After the incident, he stated he was scared to call the police. According to defendant, this was the first time he met Jim. Defendant stated that he never made or discussed a plan to kill and rob Jim and there was no indication Brandon was going to attack Jim. However, about two weeks prior to this night, Brandon called Jim and asked about a gun because he knew someone with money and an expensive sound system in his truck. Defendant testified that he owned a gun, which was in his house that night, and he smoked one joint that night.
Defendant explained that Jim said he was ready to leave. As Jim walked to the door, Brandon got up and put his belt around Jim's neck and pulled Jim backwards while Jim flailed his arms. Defendant claimed that he believed Brandon was playing around when he put his belt around Jim's neck. When Jim accidentally hit him, defendant reacted by getting up and hitting him back three times. Defendant claimed punching him three times in the nose was a reflex. Thereafter, Brandon pulled Jim to the back room.
Defendant followed them into the back room and stepped over Jim's legs to turn on the dimmer switch. He saw Brandon kicking Jim with the belt still around his neck. Because he was scared of what Brandon might do, he told him to stop, but physically did nothing. Brandon pulled Jim back into the kitchen and wrapped him in a blanket. Brandon then dragged Jim to the back door. Not wanting Jim's body in his house, defendant helped put Jim in the back of the truck. Timothy and Brandon put a mattress on top of Jim's body. Defendant stated that he rode on the tailgate of the truck and they dropped him off at his apartment. After calling Traci and telling her what happened, a friend brought him back to his house. He stated he did not intend to kill or hurt Jim.
Dr. Susan Garcia, an expert in forensic pathology, testified that she performed an autopsy on the body of James Rogers on February 16, 2002. She listed his death as a homicide, and determined the cause of death was ligature strangulation. Dr. Garcia testified that something was placed around his neck and tightened so as to cut off the blood flow to and from the brain. She testified that a belt could have been the weapon used. She noted that the victim received a blunt force trauma to the left side of his face with bruising and abrasions to his left eye, left cheek, mid-forehead and left side of his nose. She testified that punching is a manner in which these injuries could have been sustained.
Dr. Garcia testified that there were no signs of drowning and that she did not believe the victim died from the fall from the interstate. She further explained that he was probably dead at the time his body hit the ground and that it was highly unlikely he was alive but could not answer if he was on the "last edges of life." She stated that he was unconscious from the *999 time he was strangled and it was highly unlikely he would have been revivable. She explained that ligature strangulation is not an instantaneous death.
Dr. Garcia testified that the victim had two small lacerations on his liver which indicated some blunt trauma to that area. Because the injury had a small pocket of blood next to it and no overlying skin injury, she felt this negated a reaction that would happen when the victim was alive and, therefore, concluded that the injury happened at or about the time of death. Dr. Garcia testified that when she examined the victim's body, rigor mortis was fully developed. She stated that if she was told the body was not discovered for about three days that this would be inconsistent with this finding unless it was very cold or if the body was fully submerged in colder water.[2] The body showed no signs of decomposition. At the time of the exam, the victim did have an elevated blood alcohol level and THC, the major metabolite of marijuana, in his urine.
Dr. Gerald E. Liuzza, an expert in forensic pathology, testified that although there was evidence of ligature strangulation, he testified that he could not exclude the possibility this person was alive and died from the fall. He further testified that to find a body that had been dead three days with fully developed rigor would be unusual even at a temperature of fifty-nine degrees, suggesting that Jim could have been alive when he was thrown over the interstate. Ultimately, he concluded that based on the findings, he could not say definitely Jim was dead at the time he was thrown over the overpass.
After hearing the testimony and reviewing the evidence presented, the twelve-member jury found defendant guilty of the responsive verdict of manslaughter. On appeal, defendant raises two assignments of error: the trial court erred in failing to grant the defense's motion for new trial or motion for post-verdict judgment of acquittal and the trial court erred in imposing an excessive sentence.
In his first assignment of error, defendant argues that the trial court erred in failing to grant the defense's motion for new trial or motion for post-verdict judgment of acquittal. Defendant contends that the trial court erred in failing to grant a new trial or post-verdict judgment of acquittal because the evidence presented by the State was insufficient to support his manslaughter conviction. The defendant further contends that he was not a principal to the murder of James Rogers and that there was no evidence that he aided and abetted in the strangulation of the victim or counseled Brandon to commit the murder. Defendant argues that no evidence was presented to support the State's theory that defendant's battery on the victim assisted Brandon in his attack or that defendant had knowledge of or was involved in Brandon's plan to kill and rob the victim. Finally, defendant adds that it is more likely that the victim died from being thrown from the interstate.
The State responds that this claim is without merit because the State presented evidence from which a rational fact-finder could have found defendant committed the indicted offense of second degree murder when, as a principal, he aided Brandon in the strangling death of the victim by punching him during the attack. The State believes the verdict rendered *1000 was a compromise verdict.[3]
In considering the sufficiency of the evidence, the standard for appellate review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis as found in the original). When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 mandates that assuming every fact to be proved that the evidence tends to prove, to convict it must exclude every reasonable hypothesis of innocence. State v. Lathers, 03-941 (La.App. 5 Cir. 2/23/04), 868 So.2d 881, 884. However, La. R.S. 15:438 does not establish a standard that is separate from the Jackson standard, but instead provides a helpful methodology for determining the existence of reasonable doubt. Id. To support the conclusion that the defendant is guilty beyond a reasonable doubt, all evidence, both direct and circumstantial, must be sufficient. Id.
In assessing other possible hypotheses in circumstantial evidence cases, the appellate court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, 1020, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). Instead, the reviewing court evaluates the evidence in the light most favorable to the prosecution and determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under the Jackson standard. Id.
"All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." La. R.S. 14:24. Only those persons who "knowingly participate in the planning or execution of a crime" are principals to that crime. State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427, 428. An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. Id. The mental state of one defendant may not be imputed to another defendant. Thus, mere presence at the scene of a crime does not make one a principal to the crime. State v. Coleman, 02-0345 (La.App. 5 Cir. 9/18/02), 829 So.2d 468, 471. However, "`[i]t is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention.'" State v. Kirkland, 01-425 (La.App. 5 Cir. 9/25/01), 798 So.2d 263, 269, writ denied, 01-2967 (La.10/14/02), 827 So.2d 415 (quoting State v. Anderson, 97-1301 (La.2/6/98), 707 So.2d 1223, 1225). A defendant can be convicted of intentional murder even if he has not personally *1001 struck the fatal blows. State v. Wright, 01-0322 (La.12/4/02), 834 So.2d 974, 982-983, cert. denied, 540 U.S. 833, 124 S.Ct. 82, 157 L.Ed.2d 62 (2003).
The jury was instructed as to both theories of manslaughter as set forth in La. R.S. 14:31(A). According to La. R.S. 14:31(A), manslaughter is defined as
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or
(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Article 30 or 30.1.
Defendant concedes, in his brief on appeal, that La. R.S. 14:31(A)(2)(a) applies. It appears the jury was instructed that the intentional misdemeanor applicable to this case was simple battery.
In State v. Brown, 02-1922 (La.5/20/03), 846 So.2d 715, 716, defendant was indicted for first degree murder and convicted of manslaughter after a bench trial. The defendant admitted to an altercation with the victim, but claimed he left her alive and that she chased him and perhaps died accidentally by falling on tree stumps or, alternatively, that a man she had taken money from earlier murdered her. Id. at 718. Although the court of appeal reversed defendant's conviction and sentence, the Louisiana Supreme Court reinstated the conviction. Id. at 716. Notably, this case involved subsection (A)(2)(a) of the manslaughter statute and like the present case, the defendant admitted to committing a battery upon the victim. Id. at 721. Further, in Brown, the defendant opined that the victim may have died as a result of a fall, in contravention to the medical examiner's testimony. The supreme court stated, "[w]hile the defense expert speculated otherwise, the district judge evidently found the coroner's testimony more credible, a reasonable conclusion given that it was Cogswell who performed the autopsy on the victim's body." Id. at 722.
In the present case, Dr. Garcia, who performed the autopsy, testified that the cause of Jim's death was ligature strangulation and denied that Jim died as a result of the fall from the interstate. However, the defendant's expert, Dr. Liuzza, testified he could not exclude the possibility that Jim died from the fall. For support of this theory, Dr. Liuzza testified that finding a body that was dead for three days with fully developed rigor mortis, as suggested by Dr. Garcia's findings, would be unusual even at a temperature of fifty-nine degrees.
As in State v. Brown, supra, the jury could have found the testimony of Dr. Garcia more credible since she conducted the autopsy on Jim's body. In addition, the record reflects that Jim appeared to be *1002 dead prior to his body being thrown over the overpass, as stated in Timothy's testimony and recorded statement. Likewise, according to defendant's statement, Brandon checked defendant and concluded he was dead. It is not the function of the appellate court to second-guess the credibility determinations of the trier of fact or to reweigh the evidence. State ex rel. Graffagnino v. King, 436 So.2d 559, 563 (La.1983); State v. Carter, 98-24 (La.App. 5 Cir. 5/27/98), 712 So.2d 701, 708, writ denied, 98-1767 (La.11/6/98), 727 So.2d 444.
The evidence presented suggests that defendant was a principal to manslaughter by aiding and abetting Brandon. A rational jury could have found that Jim died as a result of Brandon strangling him with his belt. Defendant admits that he punched Jim while Jim was being dragged by Brandon with a belt around his neck. It is reasonable that the jury chose to disbelieve that defendant struck Jim as a reflex in reaction to being struck, not knowing what was actually happening, especially after Brandon's conversation with him about killing and robbing someone with a nice sound system in his truck. By committing simple battery upon Jim as he was being strangled, Jim's struggle and ability to defend himself was hindered, if not completely lost. By making Jim an easier target, defendant enabled Brandon to execute his plan to kill and rob Jim.
Further evidence reflects defendant participated in getting Jim's body out of his house. Although defendant had a cell phone, he did not call for help or report the crime. Defendant argues he had a gun in his house that could have been used to shoot Jim if defendant desired; however, defendant could have used this gun to stop the commission of the crime. Defendant later created an alibi for himself and had three others lie for him.
Based on the above, the facts, viewed in the light most favorable to the State, were sufficient to support defendant's manslaughter conviction beyond a reasonable doubt. We conclude that the trial court did not err in denying defendant's motion for new trial and for post-verdict judgment of acquittal because the State presented sufficient evidence to support defendant's conviction. We, therefore, find this assignment of error lacks merit.
In his second assignment of error, defendant argues that the trial court erred in imposing an excessive sentence. Defendant contends that his 25-year sentence is excessive and unconstitutional because the trial court failed to give adequate weight to the mitigating factors present, the sentence imposed is severe, and not specifically tailored to defendant under the circumstances of this case. Specifically, defendant contends he was 19 years old at the time of the incident, had no criminal background, was a hardworking member of society, had a child to support with another on the way, was planning a wedding with the mother of his children, always maintained a job, supported himself and his family, did not profit from the victim's death, did not do anything deliberately cruel to the victim and was a first-time offender. He adds that members of his family and others spoke up for him at the hearing and that he testified that he was sorry. Finally, he asserts that more culpable defendants, including those that have shot or stabbed someone to death, have received much lighter sentences.[4]
*1003 The State responds that the sentence imposed upon defendant was not constitutionally excessive but was a mid-range sentence imposed after the trial court considered the factors outlined in La.C.Cr.P. art. 894.1. The State further contends that the trial court did not abuse its discretion due to the circumstances of this case.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive, even if it is within the statutory limits, if it is grossly disproportionate to the severity of the offense or imposes needless and purposeless pain and suffering. State v. Lobato, 603 So.2d 739, 751 (La.1992). Trial judges have great discretion in imposing sentences and such sentences will not be set aside as excessive absent clear abuse of that broad discretion. State v. Allen, 03-1205 (La.App. 5 Cir. 2/23/04), 868 So.2d 877, 879.
In reviewing a sentence for excessiveness, the reviewing court must consider the crime and the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock its sense of justice, recognizing at the same time the wide discretion afforded the trial judge in determining and imposing the sentence. State v. Lobato, supra; State v. Allen, supra. There is no requirement that specific matters be given any particular weight at sentencing. State v. Tracy, 02-0227 (La.App. 5 Cir. 10/29/02), 831 So.2d 503, 516, writ denied, 02-2900 (La.4/4/03), 840 So.2d 1213.
On appeal, the reviewing court determines whether the trial court abused its discretion, not whether another sentence might have been more appropriate. State v. Allen, supra at 879-880. In reviewing a trial court's sentencing discretion, three factors are considered: 1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts. Id. at 880.
However, the trial judge is afforded wide discretion in determining a sentence, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed. State v. Uloho, 04-55 (La.App. 5 Cir. 5/26/04), 875 So.2d 918, 933, writ denied, 04-1640 (La.11/19/04), 888 So.2d 192. As provided in La. R.S. 14:31(B), a defendant found guilty of manslaughter shall be imprisoned at hard labor for not more than forty years. Defendant was sentenced to imprisonment for twenty-five years.
In the present case, before imposing the sentence, the trial judge stated the considerations taken into account and the factual basis for the sentence imposed. The judge stated that his function was to consider the crime for which defendant was convicted, his acts that constituted that crime, Louisiana sentencing guidelines, evidence presented at the sentencing hearing, and a pre-sentence investigation report.[5]
The trial judge gave several reasons for imposing the 25-year sentence. The trial judge stated that defendant had a choice the night that Jim Rogers was strangled to help the victim while he was being brutally attacked. The trial judge did not believe *1004 defendant's statement that he was afraid of Brandon, who was armed only with a belt. The trial judge opined that defendant and Jim could have overpowered Brandon. The court believed that, if fear was a factor, defendant could have run out of the house for help. The court went on to say that "the sad truth is that if you would have had the moral fortitude, the strength of character, any basic decency at all that night, I believe that Jim would still be with us today." Further, the trial judge stated that he hoped that defendant developed a conscience while he was in prison.
The trial judge also provided the facts that he considered in determining the sentence. First, he considered that the choice defendant made that night was to beat Jim with his fists while Jim was being brutally strangled. He noted that this was not the reaction of a normal person who could see what was happening to Jim. The judge further stated that, "I can only conclude that your choice to begin beating Jim was due to a complete loss of a sense of decency and humanity, and was due to a complete moral bankruptcy on your part."
Second, the trial judge found that, from the beginning, defendant tried everything in his power to attempt to minimize his involvement in this murder by lying and having others lie for him. Because of this, the judge decided that any doubt as to the extent to which he beat Jim should not be resolved in defendant's favor. The court chose to give Brandon's taped confession some weight since he did come forward and admit his involvement. When Brandon was asked how defendant helped him, Brandon stated that defendant was punching him while he strangled him in his ribs and his head. He stated that defendant was right next to him and he guessed defendant was trying to keep Jim from moving around by hitting him. The court expressed that it believed defendant's involvement was more than the three punches and, further, that defendant continued to punch Jim after he was dragged into the back room.
Third, the trial court noted that, although his physical act of punching Jim was not the physical act that caused the medically determined cause of death, (asphyxiation by strangulation), his actions did contribute to Jim's death. The trial judge stated that Jim might have had a fighting chance against Brandon Stein if defendant had not started hitting him. The trial court believed defendant's conduct manifested deliberate cruelty, that defendant used actual violence, and his actions contributed to Jim's death. The court noted that, until the sentencing hearing, the defendant failed to express remorse for his actions, instead attempting to minimize his responsibility.
The trial court also discussed mitigating factors taken into account in determining defendant's sentence. The factors are that the attack on Jim was initiated by Brandon with no apparent warning to defendant, defendant was not the sole actor in the crime, the medically-determined manner of death was physically performed by Brandon, defendant had no history of convictions for any serious offenses prior to the commission of this crime and, by the judge's calculation, he had just turned 20 years old at the time of the crime.
In State v. Bowman, 95-0667 (La.App. 4 Cir. 7/10/96), 677 So.2d 1094, writ denied, 96-2070 (La.1/31/97), 687 So.2d 400, the defendant, although charged with second degree murder, was convicted of manslaughter as a principal in a drive-by shooting in which defendant drove the vehicle from which the fatal shot was fired. The Fourth Circuit held that a 33-year sentence at hard labor was not excessive. In this case, the defendant argued that he was only 16 years old at the time and was *1005 a first offender. He further asserted that he did not do the shooting and no evidence proved he knew the victim would be shot or killed. The trial court considered the following: defendant's youth, that he was a principal to the crime of the wanton shooting of the victim without provocation, that the jury verdict of manslaughter reflected the reduced culpability of the defendant, his belief that defendant was a menace to society and should be removed from the streets to protect others and that the defendant did not pull the trigger.
In State v. Major, 96-1214 (La.App. 4 Cir. 3/4/98), 708 So.2d 813, writ denied, 98-2171 (La.1/15/99), 735 So.2d 647, the court determined a 30-year sentence was not excessive for a principal to the crime of manslaughter.[6] In this case, defendants in one car shot into another car after an argument in a parking lot. In this case, the defendants were first offenders. The trial judge based the sentences on the egregiousness of the offense and the fact that a lesser sentence would deprecate the seriousness of the offense. The judge noted the dispute began over a parking place and that the perpetrators were riding around with a submachine gun in their vehicle, discussing the danger posed on the community by firing such a weapon with no regard for the intended victim or an innocent bystander.
In this case, we find that the trial judge properly considered the factors set forth in La.C.Cr.P. art. 894.1. In considering the nature of the crime and in light of other cases involving principals to manslaughter, defendant's sentence is not excessive, despite defendant's lack of criminal history and his youthfulness. Even though Brandon initiated the attack on Jim and physically strangled Jim, defendant portrayed substantial cruelty in punching Jim while he was helplessly being strangled. Under the circumstances of this case, we find that the trial court did not abuse its discretion by imposing a mid-range sentence that does not shock the sense of justice when considered in light of the crime committed. We find no merit to defendant's second assignment of error.
Finally, as is our practice, the record was reviewed for errors patent, according to La.C.Cr.P. art. 920. We have found no errors that require correction. Accordingly, defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] In fact, this is the story Timothy gave when he was first interviewed by the police on February 13, 2002.
[2] Michael D. Jackson, the lead SCPSCO's Crime Scene Technician on the case, testified that Jim's feet were in water when his body was recovered. When the body was recovered, the temperature was fifty-nine degrees, and it was raining.
[3] The State argues that because the evidence was sufficient to support a second degree murder conviction, it was sufficient to support the lesser responsive verdict of manslaughter. When a defendant fails to object to a legislatively responsive verdict, the defendant's conviction will not be reversed, whether or not that verdict is supported by the evidence if the evidence is sufficient to support the offense charged. State ex rel. Elaire v. Blackburn, 424 So.2d 246, 252 (La.1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983); State v. Harrell, 01-841 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1017 (citation omitted). However, this issue is not addressed because it appears that the evidence was sufficient to support a manslaughter conviction.
[4] In his brief, defendant misstates the sentencing range for manslaughter as zero to twenty-five years.
[5] The presentence investigation report was filed into the record under seal. This report reflects that defendant has the following adult criminal record: disturbing the peace (cursing), resisting an officer by refusing to move on (fine satisfied), principal to second degree battery and simple robbery (charges refused), and municipal or traffic attachment (fugitive). Further, defendant received a three-year sentence for simple escape while awaiting trial. A recommendation was made for the maximum sentence of 40 years.
[6] In this case, the court found evidence was sufficient to find defendant Major was a principal to manslaughter when one witness claimed to have seen the gun come out of the passenger side, which would indicate he was a shooter and several witnesses testified defendant was involved in the dispute in the parking lot prior to the shooting. Also, the co-defendant testified that defendant picked him up in the vehicle and the rifle was already in it.