# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 04-360

STATE OF LOUISIANA

VERSUS

MATTHEW JAMES NOLAN

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT
PARISH OF SABINE, NO. 56353
HONORABLE ROBERT EDWARD BURGESS, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## MARC T. AMY
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Marc T. Amy, and John B. Scofield\*, Judges.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

**Honorable Don M. Burkett**
**District Attorney**
**Post Office Box 1557**
**Many, LA   71449**
**(318) 256-6246**
**COUNSEL FOR APPELLEE:**
       **State of Louisiana**

**Anita D. McKeithen**
**John N. Bokenfohr**
**McKeithen & Johnson**
**616 Jordan Street**
**Shreveport, LA   71101**
**(318) 222-0244**
**COUNSEL FOR DEFENDANT/APPELLANT:**
       **Matthew James Nolan**

\* John B. Scofield participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore

**Anna Louise Garcie**
**Soileau & Garcie**
**730 San Antonio Avenue**
**Many, LA   71449**
**(318) 256-0076**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
 **State of Louisiana**

**Matthew James Nolan**
**Sabine Parish Detention Center**
**384 Detention Center Road**
**Many, LA 71449**

AMY, Judge.

The defendant was charged with second degree murder following the death of his infant son. After a bench trial, the defendant was convicted as charged and was ultimately sentenced to life in prison without benefit of parole, probation, or suspension of sentence. The defendant now appeals, asserting that the evidence presented was insufficient to support a conviction and that he was denied effective assistance of counsel. For the following reasons, we affirm and remand with instructions to amend the minutes of sentencing.

## Factual and Procedural Background

According to the record, shortly before nine o'clock on the morning of June 27, 2002, Detective Bradley Marr of the Sabine Parish Sheriff's Department was leaving the detention center in Many, Louisiana, when he received a radio transmission from dispatch requesting assistance at a Many residence for an infant who was reportedly not breathing. During the trial in the matter, Detective Marr explained that upon arriving at the scene, he came upon Amber Leann Koss and the defendant, Matthew James Nolan, crouched on the living room floor above an infant, C.N., to whom the defendant appeared to be administering rescue breathing. Detective Marr recalled that soon after he arrived, paramedics came and began performing CPR on the infant. According to Detective Marr's testimony, Ms. Koss—the infant's mother—asked the defendant—the infant's father—what had happened to the child, and the defendant responded that he had dropped him. The defendant explained to Detective Marr that he was preparing a bottle for C.N. in the kitchen while holding him, and C.N. slipped through his arms. The paramedics left to take C.N. to Sabine Parish Hospital, and Ms. Koss and the defendant followed.

Detective Marr testified that after the paramedics and the infant's parents had left for the hospital, he went into the kitchen, where he saw a bottle and nipple but was unable to discern where the infant had fallen on the floor. He recalled that although he located milk and formula in the refrigerator, none was on the counter. He testified that he got on the floor and felt the carpet for spilled milk or formula and found no wet spots. Similarly, there was no milk spilled on the counter.

Detective Marr stated that he went to see Ms. Koss and the defendant at the hospital, and Ms. Koss and the defendant agreed to come to the detention center for questioning. After waiving his *Miranda* rights at the beginning of his interview, the defendant told Detective Marr and Detective Jack Stanton that since the birth of C.N., he had been staying with the baby and its mother at the home of the child's maternal grandfather. He stated that the previous night, he and Ms. Koss had stayed up all night at home in the living room; she was making posters for her father's birthday, and he was playing video games. The defendant said that Ms. Koss was still making posters when he fell asleep between five-thirty and six o'clock that morning, and he awoke between nine and nine-thirty because his son, who had fallen asleep on his chest, was crying. The defendant stated that he got up and took the baby into the kitchen to feed him, holding the pitcher of formula in his right hand, the bottle in his left hand, and C.N. in the crook of his left arm. According to the defendant, as he was filling the bottle, the baby slipped through his arm and fell onto the kitchen floor, a distance of roughly four and a half feet. He said that it appeared that C.N. hit the floor with his buttocks and back at the same time. The defendant told detectives that he immediately attended to his son, who seemed okay except that it appeared that he was not breathing. He stated that he flipped the baby over and patted him on the back

2

and buttocks in an attempt to induce breathing. The defendant said that he then ran to the back, where he found Ms. Koss in the shower. He recalled that he told her he had dropped the baby and it seemed like he wasn't breathing, and he instructed her to call 911. The defendant denied that he and Ms. Koss had any visitors the previous night and averred that neither of them had consumed any alcohol or drugs. When asked if he and Ms. Koss had had any recent problems, the defendant answered in the negative. He further indicated that the baby had been very cranky over the past two to three days and had been spitting up its formula, prompting Ms. Koss to change his formula. Detective Marr testified at trial that the defendant's statement was not in keeping with what he found at the scene. However, he noted that the defendant's statements regarding what had happened were consistent.

C.N. was airlifted from Sabine Parish Hospital to Louisiana State University Medical Center in Shreveport on June 27 for further treatment. Detective Marr stated at trial that after he received a preliminary report from LSU Medical Center indicating that C.N. had suffered severe brain trauma due to a non-accidental injury, he began the process of securing a warrant for the defendant's arrest. The record reflects that on June 28, 2002, the defendant was arrested on the charge of second-degree cruelty to juveniles; the following day, June 29, 2002, C.N. died at LSU Medical Center. A grand jury indictment was filed on September 26, 2002, alleging that the defendant committed second degree murder in the death of C.N., in violation of La.R.S. 14:30.1, further alleging that the act was perpetrated while the defendant was engaged in the perpetration of cruelty to juveniles, even though he had no intent to kill or to inflict great bodily harm. The matter was tried by a judge on July 8-9, 2003, after the defendant waived his right to a jury trial.

3

In support of its case against the defendant, the State called Dr. Lynn Lloyd, a specialist in pediatric critical care, to testify on its behalf. Dr. Lloyd, C.N.'s treating physician at LSU Medical Center in Shreveport, testified that when C.N. was presented for treatment, she noted that he had bulging fontanel (the soft spot on his head), bruising on the outsides of his arms and around his belly button, and an injury to the left side of his scrotum. She stated that shortly after C.N. was presented at the hospital, he began to have seizures, and anti-seizure medication was administered accordingly. Dr. Lloyd noted that the initial CAT scan taken of C.N.'s head showed bleeding inside, around, and outside of the brain and also indicated very severe swelling of the brain.

Dr. Lloyd testified that she spoke to Ms. Koss and to the defendant, who had followed C.N. to Shreveport, and inquired as to the child's history. She noted that the defendant told her that while he was preparing a bottle, the baby fell, landing on its buttocks and back; he noticed that the baby was not breathing, so he attempted to help him. Dr. Lloyd said that the parents were aware of the bruising around the child's belly button but had not noticed the injury to his scrotum. She further inquired as to whether anyone had shaken the baby, and the parents indicated that they had not.

Dr. Lloyd opined that the results of the CAT scan were "absolutely not" consistent with the history given by the defendant. She testified that if C.N. had fallen from a height of fifty inches, an examining physician would likely see swelling or bruising where his head hit the floor and possibly bleeding or other associated problems under that particular area of the head, if any symptoms appeared. Dr. Lloyd testified that she found no bruising on the child's head that would suggest that he had fallen. Dr. Lloyd likewise noted that brain bleeding is possible in a fall, but in C.N.'s

4

case, the CAT scan indicated bleeding throughout the brain, both intercranial and interparechymal. In addition, she ordered tests to screen for a bleeding disorder, which came back negative. Dr. Lloyd testified that there was no evidence that would support the defendant's claims as to how C.N. was injured.

Dr. Lloyd expressed the opinion that C.N. suffered a brain injury due to non-accidental trauma—*i.e.*, someone intentionally hurt or shook him. She noted that C.N.'s injuries were consistent with shaking; moreover, she noted, he sustained retinal hemorrhaging, which would be extremely unlikely in the event that he had fallen. She also observed that a fall would not yield the degree of severity of brain injury suffered by C.N. In addition, she noted that shaking the infant in an attempt at resuscitation would not produce the particular injuries sustained by C.N. Dr. Lloyd testified that after C.N. was admitted to LSU Medical Center, his condition steadily deteriorated until he died.

Dr. Terry Welke, Calcasieu Parish Coroner, also testified on behalf of the State. Dr. Welke performed the autopsy of C.N. on July 1, 2002, noting the presence of blood between the dura and the brain on the left side, and he determined the cause of death to be an intercranial hemorrhage. Like Dr. Lloyd, Dr. Welke noted bulging fontanels and bilateral retinal hemorrhaging.

Dr. Christa Rodriguez, C.N.'s pediatrician, testified that when she attended to C.N. shortly after his birth on June 4, 2002, he was suffering from jaundice. However, Dr. Rodriguez noted that this condition resolved itself, and C.N. was discharged on June 6, 2002. On June 20, 2002, C.N. was brought in for a routine check-up, which was performed by another pediatrician in Dr. Rodriguez's clinic. In the records of this visit, C.N. was described as healthy, apart from some oral thrush.

5

The State also offered the testimony of Mr. Ernest Rodrigues, a relative of the Koss family who was building a fence across the street, and Mr. Jerry Koss, C.N.'s maternal grandfather and the owner of the home in which the defendant, Ms. Koss, and the baby stayed. Both men arrived at the scene shortly before paramedics, and both men testified that the defendant stated that he dropped the baby.

Ms. Amber Leann Koss, C.N.'s mother, testified that she and the defendant had stayed up all night on June 26-27, 2002. She stated that the defendant fell asleep on the couch shortly after her father left for work at around six o'clock in the morning on July 27, but she remained awake, working on posters for her father's birthday. She testified that later on, when she got up to take a bath, C.N. and the defendant were asleep on the living room couch, with C.N. on the defendant's shoulder. Ms. Koss recalled that while she was in the bathtub, the defendant came in, carrying C.N., who was crying, and told her that he was going to feed the baby. The defendant then walked out of the bathroom. Ms. Koss testified that the next thing she knew, the defendant ran back into the bathroom and told her to call 911. She said that the defendant told her that he dropped the baby when feeding him or when fixing his bottle. Ms. Koss said that she thought the defendant was a good father.

The State tendered Dr. Scott Benton as an expert in pediatric forensic medicine. Dr. Benton stated that he had reviewed the medical records and the Social Services investigative records concerning C.N.'s injury and death. He then offered a computer presentation explaining shaken baby syndrome.[1] Dr. Benton observed that in infants, the most prevalent cause of subdural hematomas is the stretching and breaking of

---

[1]While included in the record, a portion of Dr. Benton's computer presentation is incompatible with this court's operating system. A hard copy of a portion of the presentation was, however, filed into the record. Notwithstanding the fact that the complete presentation was unavailable for review, the record is otherwise sufficient for this court's consideration.

blood vessels in the brain, the contents of which subsequently leak into the subdural space. He explained that subdural and subarachnoid hematomas are centripetal force injuries, adding that acceleration and deceleration forces acting on the brain subject nerves to the same stress as blood vessels, causing them to break and stretch, as well.

Dr. Benton testified that C.N.'s injuries were not consistent with a four-foot central linear impact fall and noted that there was no evidence of a linear impact, such as skin trauma, skull fracture, brain contusion, etc. Dr. Benton explained that among the different types of head injuries, those resulting from angular acceleration (centripetal force injuries) are more devastating than those caused by linear impact forces. He noted that in angular acceleration injuries, the head rotates at high speed on an axis, the neck, and the hallmark of angular acceleration is subdural and subarachnoid hemorrhaging in combination with an absence of external head trauma. Another indicator, he observed, is multilayered retinal hemorrhaging. Dr. Benton noted that retinal hemorrhaging is not usually associated with linear impact injuries unless there has been direct trauma to the eyes.

Dr. Benton opined that C.N.'s injuries were consistent with angular acceleration. In support of his opinion, Dr. Benton offered a summary of his findings, underscoring the presence of subdural and subarachnoid hemorrhaging and multilayered retinal hemorrhaging and the absence of external head trauma. He felt the cause of death was a diffuse axonal injury in which a large part of the left hemisphere of C.N.'s brain was injured, resulting in cell death, which in turn yielded swelling. This swelling caused a herniation of the brain, which led to brain death. Dr. Benton further observed that where a child is not breathing and is unconscious, as in C.N.'s case, the child is exhibiting signs of a brain stem injury. Finally, he

opined that "[w]ith a reasonable medical certainty, this child died of abusive head trauma and as well manifested prior trauma of likely an abusive etiology that was not the fatal cause of death."

Dr. Benton likewise found that the bruising noted on the child's buttocks was not consistent with a fall. He explained that because a child's diaper acts like an airbag, it is difficult to cause bruising on a child's buttocks. Dr. Benton found that these bruises predated the child's mortal injuries.

The defense presented testimony of a few of the defendant's friends, as well as his aunt, who attested to the defendant's fondness for his son. Those who were asked said that they never saw the defendant abusing the child.

The defendant testified on his own behalf. He stated that he was twenty-three years old as of the date of trial, that he received a GED, and that he was a carpenter by trade. He further stated that he lost his job after the birth of his son because he wanted to spend more time with the child. The defendant's testimony repeated the substance of his June 27, 2002 statement to detectives, *viz.*, that while he was preparing a bottle of formula, his son, whom he was carrying, slipped from his arm and fell onto the kitchen floor.

Following the presentation of evidence and closing arguments, the trial judge ruled that the State had proven the defendant's guilt as to the charge of second degree murder beyond reasonable doubt, excluding any reasonable hypothesis of innocence. The defendant's motion for a new trial was denied on November 7, 2003. The defendant waived delays as to sentencing, and, pursuant to La.R.S. 14:30.1(B), the trial judge imposed a term of life imprisonment without benefit of parole, probation, or suspension of sentence.

8

The defendant appeals his conviction, asserting that the evidence adduced at trial was insufficient to support a conviction for second degree murder. The defendant further claims that he did not receive effective assistance of counsel.

**Discussion**

*Errors Patent*

Pursuant to La.Code Crim.P. art. 920, this court reviews all appeals for errors patent on the face of the record. We find no such errors. However, our examination of the record indicates that although the transcript of sentencing reflects the trial judge's order that the defendant's sentence be served without benefit of parole, probation, or suspension of sentence, the minutes of sentencing do not reflect as such. Accordingly, we remand the matter to the trial court with instructions to amend the minutes of sentencing to reflect that the defendant's sentence was imposed without benefit of parole, probation, or suspension of sentence.

*Sufficiency of Evidence*

The defendant's first argument on appeal is that the evidence adduced at trial was insufficient to support a conviction for second degree murder. More specifically, the defendant asserts that the State did not exclude every reasonable hypothesis of evidence in presenting its case against him. The defendant acknowledges on appeal that the medical evidence indicting that C.N.'s fatal injuries were caused by "shaken baby syndrome." However, he points out that there was evidence that the child could have died as a result of a seizure or a fall.

In reviewing a defendant's assertions regarding insufficiency of evidence, an appellate court, viewing the evidence in a light most favorable to the prosecution, must determine whether any rational trier of fact could have concluded that the

9

essential elements of the crime were proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Brown*, 02-1922 (La. 5/20/03), 846 So.2d 715; *State v. Captville*, 448 So.2d 676, 678 (La.1984). Moreover, as in the instant matter, when circumstantial evidence provides the basis for the conviction, La. R.S. 15:438 dictates that such evidence must exclude every reasonable hypothesis of innocence. *Brown*, 846 So.2d 715.

We note that, with regard to arguments concerning sufficiency of evidence, La.Code Crim.P. art. 821 provides, in pertinent part, that:

> A. The defendant may move for a post verdict judgment of acquittal following the verdict. A motion for a post verdict judgment of acquittal must be made and disposed of before sentence.

> B. A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the State, does not reasonably permit a finding of guilty.

The record of the proceedings below does not indicate that the defendant filed a motion for post-verdict judgment of acquittal pursuant to La.Code Crim.P. art. 821; nevertheless, despite the absence of such a motion, we will consider his arguments pertaining to sufficiency of the evidence. *State v. Hampton*, 38,107 (La.App. 2 Cir. 1/28/04), 865 So.2d 284; *see also State v. Washington*, 421 So.2d 887 (La.1982).

The defendant was convicted of second degree murder in the death of C.N. In this respect, La.R.S. 14:30.1(A) provides, in relevant part, that "[s]econd degree murder is the killing of a human being: [. . .] (2)(b) When the offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or to inflict great bodily harm." Cruelty to juveniles is defined in La.R.S. 14:93(A) as "the intentional or criminally negligent mistreatment or neglect, by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or

10

suffering is caused to said child." In turn, La.R.S. 14:12 indicates that criminal negligence occurs "when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." In *State v. Richthofen*, 01-500 (La.App. 5 Cir. 11/27/01), 803 So.2d 171, the fifth circuit described the conduct punishable under La.R.S. 14:12 as disregard for a child's interest such that the conduct "amount[s] to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances." The Louisiana Supreme Court has explained that: "Unlike general or specific criminal intent, criminal negligence is essentially negative. Rather than requiring the accused intend some consequence of his actions, criminal negligence is found from the accused's gross disregard for the consequences of his actions." *State v. Martin*, 539 So.2d 1235, 1238 (La.1989). Louisiana Revised Statutes 14:30.1(B) provides that a defendant convicted of second degree murder shall be imprisoned for life without benefit of parole, probation, or suspension of sentence.

In the case *sub judice*, because the defendant was the only eyewitness to the events which caused C.N.'s death, and because the defendant consistently testified that he accidentally dropped the child, the State was forced to rely heavily upon medical evidence in seeking a conviction. Based upon our review of the record, we find that the evidence offered by the State was sufficient to support the defendant's conviction for second degree murder as charged in the indictment.

The defendant posits on appeal that C.N. could have died as a result of seizures. We note that this argument was not presented below; moreover, the State's

11

medical evidence, as outlined above, establishes that C.N. died as a result of abusive head trauma, specifically, from being shaken.

The defendant further contends that the testimonies of Drs. Lloyd and Benton were contradictory regarding the nature of C.N.'s injuries. Dr. Benton, the defendant notes, stated that as an immediate consequence of his injuries, C.N. would not have been able to cry. However, Dr. Lloyd testified that upon C.N.'s presentation at LSU Medical Center, he was trying to cry and was breathing intermittently.

Our review of the record indicates that both Dr. Benton and Dr. Lloyd concluded that C.N. died as a result of injuries sustained when he was deliberately shaken. Likewise, Dr. Lloyd testified that the child's injuries would have produced such symptoms immediately. Accordingly, the defendant's argument in this respect is not supported by the record. Moreover, with regard to the defendant's claims that C.N. could have died as a result of seizures, there is no evidence that would suggest that the seizures that C.N. suffered upon arrival to LSU Medical Center derived from anything but the neurological damage caused by the fatal injury. There is no evidence that indicates that C.N. suffered from seizures prior to June 27, 2002, and the testimony of his pediatrician was devoid of any references to neurological abnormalities.

Furthermore, although the CAT scan of C.N.'s brain indicates the presence of older blood, thereby suggesting that C.N. sustained a head injury that predated the June 27, 2002 injury, and although Dr. Lloyd testified that this prior injury could not be ruled out as a factor that contributed to C.N.'s death, we note that in presenting its case, the State is "not required to prove that [the defendant's] violent act [...] was the **sole** cause of death, but only that it **hastened** or **clearly contributed** to the child's

12

death." *State v. Obney*, 99-592, p. 9 (La.App. 3 Cir. 8/11/99), 746 So.2d 24, 29, *writ denied*, 99-2667 (La. 5/5/00), 760 So.2d 1190. (Citations omitted.) (Emphasis in original.) We find that the evidence detailed above establishes beyond a reasonable doubt that the defendant's actions clearly contributed to C.N.'s death.

Based upon our examination of the evidence adduced at trial, in a light most favorable to the prosecution, we conclude that the State proved the defendant's guilt beyond a reasonable doubt, excluding every reasonable hypothesis of innocence. Accordingly, this assignment is without merit.

*Ineffective Assistance of Counsel*

In his second assignment of error, the defendant contends that he was denied effective assistance of counsel, asserting that trial counsel failed to provide expert testimony on his behalf and failed to properly cross-examine the State's witnesses. The defendant concedes that his argument in this respect is appropriately addressed through post-conviction relief; in raising this assertion before this court, the defendant merely seeks to preserve an ineffective-assistance-of-counsel claim. Accordingly, this assignment of error presents nothing for our review at this time, and it is not properly before this court.

**DECREE**

For the foregoing reasons, the conviction of the defendant, Matthew James Nolan, is affirmed. We remand with instructions to the trial court to amend the minutes of sentencing to reflect that the term of imprisonment was imposed without benefit of parole, probation, or suspension of sentence.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

13