STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

13-1327

STATE OF LOUISIANA

VERSUS

HAROLD LEE JULIEN, JR.

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 11-1778
HONORABLE KEITH R. J. COMEAUX, DISTRICT JUDGE

**********

PHYLLIS M. KEATY
JUDGE

**********

Court composed of Elizabeth A. Pickett, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.

AFFIRMED; REMANDED WITH INSTRUCTIONS.

J. Phillip Haney
District Attorney
Angela B. Odinet
Assistant District Attorney
415 Main Street
St. Martinville, Louisiana  70582
(337) 394-2220
Counsel for Appellee:
    State of Louisiana

**Edward K. Bauman**
**Louisiana Appellate Project**
**Post Office Box 1641**
**Lake Charles, Louisiana  70602-1641**
**(337) 491-0570**
**Counsel for Defendant/Appellant:**
        **Harold Lee Julien, Jr.**

**Harold Lee Julien, Jr.**
**Louisiana State Penitentiary**
**Camp D, Raven Unit**
**Angola, Louisiana  70712**
**Defendant**

**KEATY, Judge.**

Defendant, Harold Lee Julien, Jr., was sentenced to serve life imprisonment without the benefit of parole, probation, or suspension of sentence after a jury found him guilty of second degree murder, a violation of La.R.S. 14:30.1. He now appeals. For the following reasons, we affirm Defendant's conviction and sentence.

## DISCUSSION

### *Procedural History*

Defendant was indicted for the first degree murder of his two-and-a-half-month-old son, a violation of La.R.S. 14:30. He waived formal arraignment and entered a plea of not guilty. On May 10, 2012, pursuant to Defendant's request, the trial court appointed a doctor to determine Defendant's mental capacity to proceed to trial. On July 20, 2012, the trial court granted Defendant's motion to withdraw the sanity commission request.

On June 14, 2013, a jury found Defendant guilty of the responsive verdict of second degree murder, a violation of La.R.S. 14:30.1. Defendant filed a motion for new trial, which the trial court denied. After Defendant waived all delays, the trial court sentenced him to serve life imprisonment without the benefit of parole, probation, or suspension of sentence.

Defendant now appeals, asserting that: 1) the trial court erred in granting defense counsel's motion to withdraw the sanity commission request; 2) the trial court erred in allowing him to be convicted by a less than unanimous verdict; 3) the evidence adduced at trial was insufficient to support a conviction for second-degree murder; and 4) the trial court erred in failing to grant defense counsel's challenges for cause regarding two jurors.

## *Facts*

On June 6, 2011, two-and-a-half-month-old infant, Harold Julien, III, was transported by paramedics to Dauterive Hospital in New Iberia after his father, Harold Julien, Jr., called 911 because the baby had become unresponsive. The infant was subsequently transferred to Women's and Children's Hospital in Lafayette, where he was placed on life support. It was determined that the baby had twenty-five fractures on fourteen of his ribs and a skull fracture which caused a subdural hemorrhage. The rib fractures were determined to be older injuries than the skull fracture. On June 9, 2011, the baby was removed from life support and died. An autopsy later determined the cause of death to most likely be homicide. Defendant, who was the infant's primary caregiver and alone with the infant most of the day he became unresponsive, was subsequently charged with the first degree murder of his son.

## *Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After review, we have found one error patent.

Defendant was informed at sentencing that he has two years within which to file an application for post-conviction relief. Louisiana Code of Criminal Procedure Article 930.8 provides that a defendant has two years after the conviction and sentence become final to seek post-conviction relief. In *State v. Conway*, 12-525 (La.App. 3 Cir. 11/7/12), 101 So.3d 1132, this court found a similar advisement insufficient and directed the trial court to inform the defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of the opinion and to file

written proof in the record that the defendant received the notice. Accordingly, we direct the trial court to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of the opinion and to file written proof in the record that Defendant received the notice.

## *Sufficiency of the Evidence*

We will discuss Defendant's third assignment of error that the evidence was insufficient to sustain the verdict of second degree murder first because, if the allegation has merit, Defendant could be acquitted of that offense and any following assignments of error pertaining to the verdict of second degree murder may be moot. *See Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970 (1981).

Defendant argues that there was no physical evidence that he caused the injury that killed his infant son, Harold Julien, III, and that he was convicted solely on the fact that he was with the infant the entire day the injuries were discovered. He contends that the State failed to exclude the very reasonable hypothesis that someone else caused the injuries.

In *State v. Nolan*, 04-360, pp. 9-10 (La.App. 3 Cir. 9/29/04), 882 So.2d 1246, 1252, a similar case involving an infant's death, this court stated:

> In reviewing a defendant's assertions regarding insufficiency of evidence, an appellate court, viewing the evidence in a light most favorable to the prosecution, must determine whether any rational trier of fact could have concluded that the essential elements of the crime were proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Brown*, 02-1922 (La.5/20/03), 846 So.2d 715; *State v. Captville*, 448 So.2d 676, 678 (La.1984). Moreover, as in the instant matter, when circumstantial evidence provides the basis for the conviction, La. R.S. 15:438 dictates that such evidence must exclude every reasonable hypothesis of innocence. *Brown*, 846 So.2d 715.

3

"It is the role of the fact finder to weigh the respective credibility of the witness. Therefore, the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review." *State v. Lambert*, 97-64, p. 5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 727.

In the instant case, Deputy David Hines, a patrol deputy with the Iberia Parish Sheriff's Office, testified that he received a call at 10:15 p.m. on June 6, 2011, involving a medical emergency at an apartment at 921 Oak Street. When he arrived at the apartment, paramedics were performing CPR on a small infant. There was a visibly upset man on the scene, whom he identified in court as Defendant. When Deputy Hines asked Defendant what had happened, Defendant told him that he had fed the baby and laid him down in the bassinet next to the bed. A short time later, Defendant heard the baby choking, so he tried to wake him up and burp him, but the baby was having trouble breathing, so he called 911. Defendant told Deputy Hines that twenty minutes had passed between when he put the baby down and when he heard the baby choking. Defendant also told Deputy Hines that he had performed CPR on the baby while waiting for the paramedics.

Natasha Daniels, Harold Julien, III's mother, testified that the baby was born a month premature on March 17, 2011, and died on June 9, 2011. At the time he was born, he suffered from gastroschisis, a birth defect in which an infant is born with some or all of its intestines on the outside of the abdomen. The baby was required to stay in the hospital for a month after his birth. Ms. Daniels recalled that he went back into the hospital in May for three or four days. Prior to this second hospitalization, the baby had a loud cry, but afterward, his cry was very weak. The baby could not roll over at the time of his death.

4

Ms. Daniels stated that Defendant, whom she met at Sonic in 2008 when she was pregnant with her third child, was the baby's father. Prior to the baby's death, she, Defendant, and her four children lived in a one-bedroom apartment that they shared with their friend Betsy; Betsy's boyfriend, Allen Navy; and their two young children.

Ms. Daniels testified that on June 6, 2011, she had worked from 11:00 a.m. to 5:00 p.m. After she got home, she cleaned up the apartment and fed the baby. She did not see any bruising on his body or see him wince as though he were in pain. She prepared food for her two-year-old daughter, Niah. Afterwards, she stayed in the apartment for about two hours during which time she and Defendant played around throwing water on each other. This horse-play occurred while she was holding the baby, but she denied that he got wet or hurt during that time. She then went to Wal-Mart to purchase some movies with Betsy. When she left the apartment, only Defendant and Niah were in the apartment with the baby, who was sleeping in his bassinet. At approximately 10:22 p.m., as they were leaving Wal-Mart, Ms. Daniels received a call from the hospital regarding the baby.

When shown photographs taken in the apartment pursuant to a search warrant obtained after the baby was rushed to the hospital, Ms. Daniels stated that when she got home from work on June 6, there were no holes in the wall of Betsy and Allen's bedroom as depicted in some of the photographs. She said that Defendant had a temper and that she had previously seen him hit the wall. When Defendant was in jail, he told her that after he put the baby down to get food for Niah, the baby fell off the bed and may have "hit his head on the iron part," but he picked the baby up and put him back to sleep. After Defendant bonded out of jail, he told her that a friend's four-year-old had picked up the baby and thrown him.

5

Ms. Daniels later relayed that information to the district attorney's office. She speculated that the baby's ribs may have been broken when Defendant and Allen gave him CPR before his May hospitalization.

Ms. Daniels said that her family had concerns about Defendant caring for the children. She never saw Defendant harm the baby and had no problem leaving the children in his care. She admitted, however, that before the baby was born, there were instances of her children having unexplained injuries. She testified that other than just a few hours spent with each of her two sisters, only she and Defendant took care of the baby. However, the baby had stayed with Defendant's mother for several days about two weeks before his death.

Malinda Meyers, a detective with the Iberia Parish Sheriff's Office, testified that she was the lead investigator in the matter. She had been contacted regarding an unresponsive baby at Dauterive's Hospital. There, she spoke with Ms. Daniels and Defendant before going to their apartment. The next day, she interrogated both of the parents at police headquarters and revisited the apartment to take measurements. Defendant told the detective that the baby had rolled off the bed and may have hit his head on a board that was between the bed and the wall. Detective Meyers took pictures of the bed and the area where Defendant said the baby had fallen. She testified the bed was eighteen inches off the floor and twenty-one inches away from the wall. The board Defendant indicated the baby may have fallen on was leaning against the bed and was seven inches wide. The baby's bassinet was also between the bed and the wall.

Detective Meyers talked to the attending physician at the hospital, who told her that when the baby had been admitted on May 13, 2011, prior to the current admission, no injuries were detected on his x-rays. The doctor told Detective

Meyers that the baby now had multiple rib fractures and a skull fracture with bleeding on the brain. Detective Meyers explained that the primary caregivers are suspects when a child is injured.

The video of the first of two interrogations Detective Meyers conducted with Defendant was played for the jury. The following observations were gleaned from our viewing of the video. During the interrogation, Defendant explained the events leading up to his calling 911. He told the detective that after Ms. Daniels left, he fed the baby and lay down on the bed to watch television with Ms. Daniels' two-year-old daughter. The baby was asleep on his chest. Eventually, the little girl said she was hungry. Defendant laid the baby down on the bed and went into the kitchen to warm up some food for the girl. He heard a loud cry and found the baby on the floor between the bed and the wall. He picked up the baby and patted him on the back a few times, and the baby went back to sleep. Defendant put him in the bassinet. A few minutes later, the baby began to make funny sounds and spit up milk. When he picked the baby up, he was unresponsive. Defendant undressed him to see if he was having the same problem that put him into the hospital in May, which was his bowel pushing out of his rectum. He then ran outside, and Allen, who was just outside the apartment building door, came in, and they attempted to perform CPR. Someone called 911. Defendant stated that he knew of no one who had hurt the baby, and he denied that Ms. Daniels or anyone else who lived in the apartment had harmed the baby. We note that throughout the three-hour interview, Defendant was soft spoken and appeared to be in anguish over the death of his child. His story never wavered.

Detective Meyers testified that she again interrogated Defendant on June 13, 2011, for a little more than an hour and a half. The baby had died on June 9, 2011,

7

while Defendant was incarcerated in the parish jail on unrelated charges. The video of the second interrogation was played for the jury. Therein, Defendant said he had lost his job with Wal-Mart on May 12, 2011, two days before the baby went into the hospital the second time. He basically repeated what he had told Detective Meyers during his first interrogation, adamantly repeating that he would not have harmed his son and that he did not know of anyone who would have done so.

Betsy Zuniga testified that she, Allen Navy, and their two children lived with Ms. Daniels, Defendant, and their four children. Defendant was working at Wal-Mart, and they took turns babysitting the children. Mr. Navy never babysat the baby. After Defendant lost his job at Wal-Mart, he watched all of the children a lot of the time. She corroborated Ms. Daniels' testimony that she picked her up from work at 5:00 p.m. on June 6, 2011, and that later the two of them with another friend, Raquel Navy, went to Wal-Mart. Ms. Zuniga testified that she never saw any problems with the baby except for the one time he went to the hospital in May. You could not hear the baby cry. Otherwise, he seemed to be fine when they left for Wal-Mart. She said that Defendant loved Ms. Daniels' children, and she trusted him to care for her own children. Raquel Navy corroborated Ms. Daniels' and Ms. Zuniga's testimony. She also said the baby appeared well when she saw him in the early evening of June 6, 2011.

Angeline Julien, Defendant's mother, attested to Defendant's good relationship with his first son, Jacob, by another woman. At the time of trial, Jacob was three years old. She described Defendant as good natured, never showing a violent temperament, and never having anger issues. Ms. Julien described Defendant's relationship with Ms. Daniels' children as good, and she said that the children called him, "Daddy." She testified that she had kept the baby on two

8

occasions, once overnight. When Ms. Julien kept the baby overnight in May, his cry was very weak, and she had to put him down close to her to be able to hear him if he cried during the night. She also stated that when she held the baby and attempted to play with him, his eyes would not track her voice, he would only look down. Ms. Julien told Defendant and Ms. Daniels about her observations, and they said they would take him to the doctor, but she never heard any more about it. During the times he stayed with her, Ms. Julien did not see any bruising on the baby's body or his head, nor did he act like he was in pain. She said that after the baby came home from the hospital the first time, Defendant held him all the time and that he was very protective of the baby. Ms. Julien stated that after she had kept the baby overnight, Ms. Daniels' sister, Kellie, kept him for several days.

Girard Navy and Brittney Holiday each stated they were outside when Defendant came down from his apartment and said something was wrong with his baby. When they ran up, Defendant was sitting on the bed with the baby. Allen Navy attempted to give the baby CPR, and Ms. Holiday called 911. Girard Navy said Defendant was so upset he punched holes in the walls. Ms. Holiday, who lived in the complex and was friends with Defendant and Ms. Daniels, said that she never saw any abuse directed towards the baby.

Catherine Longman, the mother of Defendant's first son, Jacob, who was three years old at the time of trial, testified that Defendant and Jacob have a typical father/son relationship. She stated that Defendant resumed having overnight visits with Jacob after he was released from jail and that she has no reservations about Defendant taking care of Jacob.

Dr. Christopher Tape, a forensic pathologist, conducted an autopsy on the baby. He testified that upon examination, he found no external evidence of injuries

9

on the baby's body; however, he determined that the back of his skull was fractured. The occipital skull fracture was of a recent nature, which had caused subdural hemorrhages and increased cranial pressure. Dr. Tape found approximately twenty-five fractures on fourteen of the baby's ribs. Those fractures were of a more chronic nature, and all were in the healing state of approximately two weeks. The fractures were located on the lateral and posterior parts of the ribs—on the sides and back of the body. Dr. Tape agreed that the location of the fractures could be consistent with holding the baby up under the arms and squeezing. Dr. Tape testified that the injuries to the baby's ribs could have resulted in his low cry. Although he explained that pin-pointing when certain injuries occur was difficult, he opined that the skull fracture occurred three to ten days prior to the baby's death. Dr. Tape agreed that a fall of eighteen inches would not have caused the damage to the child's skull. He stated that the blow would have had to be significant or a fall of at least five or six feet.

Finally, Defendant testified. He was twenty-one years old at the time of the June 2013 trial. Defendant stated that he was seventeen when his first son, Jacob, was born and that they had a good relationship. Defendant explained that he was nineteen when he met Ms. Daniels through his friend, Betsy, who worked with her at Sonic. He and Ms. Daniels clicked, and he moved in with her and her two young children after they had dated for several months. Ms. Daniels was pregnant with her third child at the time. Defendant stated that he was the primary caregiver for the baby, particularly after he lost his job at Wal-Mart. Ms. Daniels' sister, Kellie, babysat the baby for four or five days after he got out of the hospital in May.

Defendant stated that when Ms. Daniels came home from work on June 6, they laughed and had fun, and she held the baby before going to buy some movies. After she left, he held the baby, rocking him back and forth. Defendant then "playfully" released the baby onto the bed several times, trying to get him to smile. The last time he did so, the baby let out a little cry. Defendant picked him up, patted him on the back, and put him back down on the bed when he started to fall asleep. Thereafter, Ms. Daniels' daughter told him that she wanted something to eat, so he went into the kitchen to get her some food. He heard a "thump." When Defendant went back to check on the baby, he found him on the floor between the bed frame and a board. Defendant picked up the baby, patted him a few times on the back, put him back on the bed, and the baby went back to sleep. Shortly thereafter, the baby started spitting up milk, his body became pale, and his heartbeat slowed down. Defendant panicked and picked up the baby. Not having a phone or knowing what to do, he put the baby back on the bed and ran outside to get his friend Allen. Defendant found Girard Navy and Ms. Holiday who followed him back into the apartment where they found the baby still unresponsive, at which point Defendant "lost it" and punched holes in the wall. Defendant then called 911 and was told to start CPR. He did so, but Allen took over because he was panicking. When the paramedics arrived at the apartment, they were able to get a pulse from the baby which made Defendant think that everything would be all right. Defendant stated that he had taken the baby's clothes off before the paramedics arrived to check whether his gastroschisis had returned. When he went to find the clothes to dress the baby before the paramedics took him, he moved the blankets on the bed and found a heavy mug that was left on the bed from when he and Ms. Daniels were having the water fight earlier in the evening. At that point,

11

he wondered if the baby had possibly hit his head on the mug when he was rocking him. Defendant admitted that he never mentioned a mug on the bed to the police, explaining that he was scared of becoming a suspect and of being thought of as a murderer.

Defendant's brother met him at the hospital and brought him back to the apartment. There were a lot of police officers there, and he was given a copy of a search warrant. When Defendant returned to the hospital, he was told that the baby had a fractured skull and fractured ribs. He was shocked and unable to think of anyone who would have wanted to hurt the baby. At about 4:00 a.m., Detective Meyers was at the hospital and asked him to come to the Sheriff's Department for an interview later that morning. Defendant stated that he agreed to the interview even though he did not have an attorney because he had nothing to hide. After the interview, Defendant was kept at jail on unrelated charges and was unable to return to the hospital to be with his son. He denied killing his son, and he stated that he never abused him. He also denied knowing that his son had cracked ribs.

Defendant argues that the above testimony did not establish that he had the specific intent to kill his son, inflict serious bodily harm, or engage in cruelty to a juvenile. He further submits that he acted appropriately when he saw that the baby was in distress.

Louisiana Revised Statutes 14:30.1 provides, in pertinent part:

A. Second degree murder is the killing of a human being:

> (1) When the offender has a specific intent to kill or to inflict great bodily harm; or

> (2) When the offender is engaged in the perpetration or attempted perpetration of . . . cruelty to juveniles, second degree cruelty to juveniles even though he has no intent to kill or inflict great bodily harm.

The statute regarding cruelty to a juvenile provides, in pertinent part:

A. Cruelty to juveniles is:

(1) The intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child.

La.R.S 14:93.

Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Specific intent to kill or inflict great bodily harm may be inferred from "the extent and severity of the victim's injuries." *State v. Patterson*, 10-415, p. 11 (La.App. 5 Cir. 1/11/11), 63 So.3d 140, 148, *writ denied*, 11-338 (La. 6/17/11), 63 So.3d 1037.

Defendant is correct in that the only evidence given at trial to establish the offense of second degree murder was the fact that he was the primary caregiver and that the child was in his care the day of the discovery of the injuries, which does not establish the necessary element of specific intent to kill or inflict injury or unjustifiable pain or suffering. However, the baby's injuries themselves, could exhibit, at the very least, Defendant's specific intent to inflict great harm upon him.

As noted above, Dr. Tape testified that the injuries to the baby's ribs were posterior rib fractures. Ms. Daniels testified that the injuries were possibly caused by CPR administered to the baby. However, in *State v. Glenn*, 04-526, p. 7 (La.App. 5 Cir. 3/1/05), 900 So.2d 26, 31, where the defendant argued the infant's rib fractures were the result of administering CPR, a forensic expert testified that "[p]osterior rib fractures are not consistent with CPR, but are almost exclusive to child abuse, a grabbing around the chest."

Furthermore, in the current case, Dr. Tape testified the baby had to have fallen from at least five feet to have incurred the fracture to his skull. In *State v. Martin,* 11-32, p. 3 (La.App. 3 Cir. 6/1/11), 66 So.3d 608, 611, *writ denied,* 11-1441 (La. 12/16/11), 76 So.3d 1201, the ten-week-old baby died as a result of "blunt force injury" to the skull. The defendant claimed he had dropped the baby while giving her a bath. The forensic pathologist who performed the autopsy, however, testified that the injury was inconsistent with a fall and that the "skull fracture could not have been the result of her being dropped, even from chest height." *Id.* at 611.

In the current case, Defendant postulated that the skull fracture occurred when the baby rolled off a bed eighteen inches from the floor and hit his head on a board. He also stated that the baby could have hit his head on a ceramic mug when, as he sat on the bed, he dropped the baby "playfully." The jury did not find these explanations for the baby's injuries credible, and we will not second-guess that credibility determination. *See Lambert*, 720 So.2d 724.

In *State v. Miller*, 06-595, p. 3 (La.App. 3 Cir. 9/27/06), 940 So.2d 864, 867, *writ denied*, 06-2577 (La. 5/11/07), 955 So.2d 1278, wherein the only evidence of the defendant's guilt was that he was the only person with the opportunity to injure the child, this court (quoting *State v. Porter*, 99-1722, pp. 15-16 (La.App. 3 Cir. 5/3/00), 761 So.2d 115, 123-24), noted:

> Circumstantial evidence consists of the proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Guillory*, 670 So.2d at 304, *citing State v. Donahue*, 572 So.2d 255 (La.App. 1 Cir.1990). The circumstantial evidence rule does not require the State to exclude every possible theory of innocence, but only the reasonable hypotheses of innocence. *State v. Lilly*, 468 So.2d 1154 (La.1985).

> In circumstantial evidence cases, this court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, this court, evaluating the evidence in the light most favorable to the prosecution, determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *State v. Davis*, 92-1623 (La.5/23/94); 637 So.2d 1012, *certiorari denied,* 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994).

Continuing in *Miller*, 940 So.2d at 869, this court affirmed the conviction which was based on circumstantial evidence, stating:

> The testimonies of Remedies and Martinez, and Defendant's own statements, combined with the medical testimony, overwhelmingly narrow the window of time during which the victim's injuries could have occurred. It is clear from the evidence recounted above that the little girl's injuries had to have been inflicted immediately before she became symptomatic. The testimony of Martinez and Defendant's own statement show that he is the only person who was in a position to have inflicted those injuries. Martinez was in the bathroom at the relevant time, and was apparently quite ill. The record is not clear regarding the whereabouts and activities of the victim's older brother, Tristine, after the family entered the house. However, since Defendant admitted in his statement that the victim was still able to get up and walk that last time he entered her room, any theory that the boy could have inflicted the injuries is negated. Further, Defendant told police that shortly before re-entering the children's bedroom to help the victim with her jacket, he saw Tristine and instructed the boy to separate the laundry. The Defendant appears to concede that Tristine knows nothing about the crime.

> Thus, we find the trial evidence was sufficient to exclude any reasonable hypothesis that someone other than Defendant inflicted the fatal injuries.

In the current case, Defendant testified that he was the babies' primary caregiver, particularly after he lost his job from Wal-Mart in May. He stated that other than one night at his mother's house, the only other person to care for the child was Ms. Daniels' sister, who took care of the baby for several days.

15

Ms. Daniels' testimony was that each of her sisters had only spent a few hours with the baby. Prior to the baby's May visit to the hospital, there was testimony that the baby had a loud cry. Ms. Daniels testified that after the baby was discharged from the hospital in May, his cry was very low and hard to hear. However, while Dr. Tape stated that rib injuries could have caused the baby to have a weak cry, no rib injuries were detected when the baby was admitted to the hospital in May.

We conclude that the evidence was sufficient to exclude any reasonable hypothesis of innocence that anyone other than Defendant inflicted the injury which resulted in the baby's death. Defendant argues that even if this court finds him responsible for the death of his son, the evidence supports a verdict of manslaughter rather than second degree murder. He argues in his appellant brief:

> Harold Julien did not want his son to die, nor did he have the specific intent to kill or inflict great bodily harm on the child. Rather, this young, inexperienced father may have been in the grip of a sudden heat of passion, brought about by his environment, the loss of his earning ability as the head of the house, his heat of blood compounded by his anger at Natasha for leaving him alone with the children all night.

Manslaughter is defined, in pertinent part, as "[a] homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La.R.S. 14:31(A)(1). In *State v. Thornton*, 47,598 (La.App. 2 Cir. 3/13/13), 111 So.3d 1130, the defendant admitted he physically abused the infant to get back at the infant's cheating mother but argued that he was guilty of manslaughter rather than second degree murder because of the provocation. The second circuit stated:

16

[T]he measure of the "provocation sufficient to deprive an average person of his self-control" cannot be met by reference to the crying and discomfort of an innocent victim only three months old. The average person understands that no anger, much less anger accompanied by force and harm, is a reasonable response to an infant. With provocation totally irrelevant as an adult response in such instance, Thornton's asserted provocation by Ursula can likewise not be transferred so as to make in any manner his violence against the child less culpable. There is no reasonable correlation providing a degree of justification between TJ's crying, the defendant's anger over Ursula's petty and vengeful acts, and the brutality that Thornton showed his own son.

Thornton failed to prove, by a preponderance of the evidence, that circumstances existed such that he was so provoked by sudden passion or heat of blood that he was deprived of an average person's self-control and cool reflection. *State v. Logan*, [45,136 (La.App. 2 Cir. 4/14/10), 34 So.3d 528, *writ denied,* 10-1099 (La. 11/5/10), 50 So.3d 812]. Thus, the evidence was sufficient to support a conviction for second degree murder. The defendant failed to prove that he acted in sudden passion or heat of blood sufficient to reduce his culpability and render the homicide a manslaughter. *State v. Allen,* [41,548 (La.App. 2 Cir. 11/15/06), 942 So.2d 1244, *writ denied*, 07-530 (La. 12/7/07), 969 So.2d 619]. As a result, the jury's verdict was correct and the conviction is affirmed.

*Id.* at 1136-37.

There was no testimony in the record that Defendant was left alone all night with the children at any particular time. Nor was there any testimony which indicated that Defendant was stressed because he was head of the household and had lost his job. Furthermore, Defendant testified that he had experience taking care of a baby. He had helped to care for the child Ms. Daniels was pregnant with when they met and began living together. We find the testimony does not support Defendant's contention that the injury which resulted in the baby's death was caused in the heat of passion. Accordingly, the evidence was sufficient to support Defendant's conviction for second degree murder.

### *Motion to Withdraw Sanity Commission*

Defendant argues that the trial court erred in granting his motion to withdraw the sanity commission request. In May 2012, Defendant filed a motion titled "Motion for Expert for Indigent Defender." The motion requested that the State appoint an expert to determine Defendant's "current mental state and the mental state at the time of the alleged crime." Soon after, the trial court signed an order appointing Dr. Blackburn to determine Defendant's mental capacity. On June 20, 2012, the State filed a "Motion to Form Sanity Commission," notifying the trial court that, pursuant to La.Code Crim.P. art. 644, a sanity commission must consist of no less than two and no more than three members who are qualified in forensic evaluation. The trial court then ordered a second member to the commission, Dr. Michael Blue, and set a hearing date for July 31, 2012, to determine Defendant's mental capacity to proceed.

On July 12, 2012, Defendant filed a "Motion to Amend the Motion for Expert for Indigent Defendant," wherein he stated that the request for the State to appoint an expert to examine his mental capacity was made in error and should have reflected a request for the State "to pay for an expert to examine the medical records of the victim." He further requested that Dr. Emil Laga be appointed as the expert. On July 17, 2012, Defendant filed a "Motion to Withdraw Sanity Commission Request and Motion for Dr. Laga to be Court Appointed Expert." According to a July 20, 2012 minute entry, the trial court granted the request to withdraw the sanity commission request and the request to appoint Dr. Laga as an expert to review the infant's medical records but at Defendant's cost.

Defendant points out that La.Code Crim.P. art. 642, in pertinent part, provides; "[w]hen the question of the defendant's mental incapacity to proceed is

18

raised, there shall be no further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed." Citing *State v. Carney*, 25,518 (La.App. 2 Cir. 10/13/95), 663 So.2d 470, Defendant further contends that the act of withdrawing a motion to appoint a sanity commission has been considered to be a further step in the prosecution.

In brief, the State argues that the record indicates it was an obvious error that a request for a sanity commission was made, as Defendant's original motion was titled "Motion for Expert for Indigent Defender." In addition, it was the State who actually filed the motion titled "Motion to Form Sanity Commission," and Defendant filed the motion to withdraw the sanity commission request before the hearing on the matter could take place.

In *Carney*, 663 So.2d at 473, the second circuit stated:

> "Due process and our statutory law require that the issue of the defendant's mental capacity to proceed shall be determined by the court." [*State v.*] *Rogers*, [419 So.2d 840, 843 (La.1982)]. "This cardinal principle . . . prohibits [the court] from committing the ultimate decision of competency to a physician or anyone else." *Id.* Furthermore, the above articles, when read in pari materia, implicitly require the trial court to rule on the defendant's motion and determine whether a "reasonable ground to doubt the defendant's mental capacity" exists before proceeding further in the prosecution. Withdrawing a motion to appoint a sanity commission is a further step in the prosecution. Also, permitting such a motion to be withdrawn takes the ultimate decision of competency away from the court. Thus, although a mental examination may not be required in every case where the issue of mental capacity is raised, *State v. Wilkerson*, 403 So.2d 652 (La.1981); *State v. Folse*, 623 So.2d 59 (La.App. 1st Cir.1993), the record must reflect that the trial court made a determination of whether or not reasonable grounds exist to doubt the defendant's capacity to proceed.

The defendant in *Carney* was charged with the second degree murder of his ten-week-old daughter. The defendant admitted he abused the infant "by dropping her on the floor, throwing her on the bed[,] and slapping her in the face." *Id.* at

19

471. Defense counsel filed a motion to appoint a sanity commission. In the motion, he stated that the defendant "appeared to be hallucinating, could not assist counsel during interviews, and did not have the mental capacity to understand the proceeding against him or assist in his defense." *Id*. at 472. The district attorney requested a hearing on the motion, and the trial court set a date to determine whether to appoint a sanity commission. On that date, defense counsel, without the appearance of the defendant, moved to withdraw the motion, and the trial court granted the motion. The second circuit reversed the conviction, stating:

> [T]he defendant sufficiently raised the issue of his mental capacity to proceed after the indictment was filed.
>
> After the defendant raised the issue, the trial court allowed further steps in the prosecution to occur without making a determination of the defendant's mental capacity to proceed to trial. When defense counsel withdrew the motion to appoint a sanity commission, the defendant was not present and the trial court did not observe or question him about his mental capacity. At the very least, the record should reflect that the trial court should have personally observed the defendant and questioned him as to his understanding of the proceedings to determine if a "reasonable ground" existed to doubt his mental capacity. Further, as noted by the United States Supreme Court, it is contradictory to argue that a defendant may be mentally incompetent, and yet he may knowingly or intelligently waive his right to have the court determine his mental capacity to stand trial. *Pate* [*v. Robinson,* 383 U.S. 375, 86 S.Ct. 836 (1966)], *State v. Harris*, 406 So.2d 128 (La.1981).

*Id*. at 473.

In *State v. Juniors*, 05-649 (La.App. 3 Cir. 12/30/05), 918 So.2d 1137, *writ denied,* 06-267 (La. 9/15/06), 936 So.2d 1257, *cert. denied*, 549 U.S. 1226, 127 S.Ct. 1293 (2007), the defendant filed a motion for a sanity commission. The trial court granted the motion and appointed two doctors to examine him. Both doctors conducted an examination and submitted letters to the court stating that the defendant was capable of proceeding to trial and that he was not suffering from a

mental disorder such that undermined his ability to understand right from wrong. Thereafter, there was nothing entered into the record which showed that there was a contradictory hearing or that the trial court made a determination regarding the defendant's mental capacity. After conviction, the defendant alleged on appeal that the trial court erred when it allowed him to be tried without adjudicating his competency to proceed to trial. This court conditionally affirmed the conviction and remanded the matter to the trial court to determine whether a *nunc pro tunc* hearing was possible, noting as follows:

> The supreme court discussed the need to address a defendant's competency in *State ex rel. Seals v. State*, 00-2738, pp. 5-6 (La.10/25/02), 831 So.2d 828, 832-33 (citations omitted) (emphasis added), as follows:
>
> > At the outset, we note the longstanding precept that a defendant does not have an absolute right to the appointment of a sanity commission simply upon request. *A trial judge is only required to order a mental examination of a defendant when there are reasonable grounds to doubt the defendant's mental capacity to proceed.* It is well established that "reasonable grounds" exist where one should reasonably doubt the defendant's capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense. To determine a defendant's capacity, we are first guided by La.Code Crim. Proc. arts. 642, 643, and 647.
> >
> > . . . .
> >
> > This protection, however, is not to say that every time a defendant feigns incapacity the court must order a full-blown sanity commission. In *State v. Berry*, 391 So.2d 406, 411 (La.1980), we firmly held that the trial court is granted great discretion in determining if a defendant should be afforded a mental examination to determine capacity. Indeed, where a trial judge finds enough evidence to doubt a defendant's capacity, the court may order the defendant be examined by a single psychiatrist to satisfy requirements of La.Code Crim. Proc. art. 643. There is no need for a sanity commission

21

to be appointed each time capacity of a defendant is questioned.

> That being said, questions regarding a defendant's capacity must be deemed by the court to be *bona fide* and in good faith before a court will consider if there are "reasonable grounds" to doubt capacity. *Where there is a bona fide question raised regarding a defendant's capacity, the failure to observe procedures to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial.* At this point, the failure to resolve the issue of a defendant's capacity to proceed may result in nullification of the conviction and sentence under *State v. Nomey*, 613 So.2d 157, 161-62 (La.1993), or a *nunc pro tunc* hearing to determine competency retrospectively under *State v. Snyder*, 98-1078 (La.4/14/99), 750 So.2d 832.

*Id.* at 1143-44.

In the current case, we conclude that the trial court did not have reasonable grounds to doubt Defendant's mental capacity to proceed. The caption of the initial motion filed with the trial court referenced the appointment of an expert for Defendant, who is indigent. While a generic request for a mental examination was made in the body of the motion, there was no specific example of the reason the request was made, such as in *Carney*, 663 So.2d at 472, wherein it was stated that the defendant "appeared to be hallucinating, could not assist counsel during interviews, and did not have the mental capacity to understand the proceeding against him or assist in his defense." Because the record supports the finding that Defendant erroneously requested that an expert be appointed to examine his mental capacity, the trial court committed no error in granting Defendant's request to withdraw the sanity commission request.

### *Unanimous Jury Verdict*

Defendant argues that because he was charged with first degree murder, he was entitled to a unanimous jury verdict even though he was convicted of the lesser included offense of second degree murder because there was nothing in the record to indicate that the State opted not to seek the death penalty. In support of his argument, Defendant cites La.Code Crim.P. art. 782, which provides:

> A. Cases in which punishment may be capital shall be tried by a jury of twelve, all of whom must concur to render a verdict. Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. Cases in which the punishment may be confinement at hard labor shall be tried by a jury composed of six jurors, all of whom must concur to render a verdict.

Defendant further relies on *State v. Goodley*, 398 So.2d 1068 (La.1981), wherein the defendant was charged with first degree murder but convicted of manslaughter by an eleven to one vote. The supreme court reversed the conviction, holding:

> [I]t is clear that the vote on the lesser included offense, which acts as an acquittal verdict on the capital charge, must conform to the requirements for a lawful verdict on the greater offense, a unanimous verdict. Any other conclusion would violate the constitutional mandate that a "verdict" in a capital case must be by a unanimous jury.

*Id.* at 1070.

While *Goodley* was correctly decided based on the law at the time of its rendition, effective August 15, 2007, the first degree murder statute, La.R.S. 14:30, was amended by 2007 La. Acts No. 125, § 1, to provide as follows:

> C. Penalty provisions.
>
> (1) If the district attorney seeks a capital verdict, the offender shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The

provisions of C.Cr.P. Art 782 relative to cases in which punishment may be capital shall apply.

（2) If the district attorney does not seek a capital verdict, the offender shall be punished by life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. The provisions of C.Cr.P. Art 782 relative to case in which punishment is necessarily confinement at hard labor shall apply.

Here, Defendant was convicted of second degree murder by a ten-to-two vote. The Bill of Indictment charged Defendant with first degree murder but did not state without the death penalty. However, a minute entry dated December 13, 2011, of the grand jury proceedings, stated:

The Court called for the indictments. The foreman handed the Clerk the report and indictment and the Clerk handed the[m] to the Court. The Court then instructed the Clerk to read the indictment.

The Grand Jury returned a true bill on the accused, the charge of First Degree Murder without the death penalty.

The jury was also informed that the death penalty was not being sought during *voir dire* and again when the trial court gave the jury their instructions following the trial.

Accordingly, under the current version of La.R.S.14:30(C)(2), there was no requirement that Defendant be convicted by a unanimous verdict of twelve jurors. *See State v. Bishop*, 10-1840 (La.App. 1 Cir. 6/10/11), 68 So.3d 1197, *writ denied*, 11-1530 (La. 12/16/11), 76 So.3d 1203, and *State v. Clarkson*, 11-933 (La.App. 3 Cir. 3/7/12), 86 So.3d 804, *writ denied*, 12-788 (La. 9/28/12), 98 So.3d 826. There is no merit to this assignment of error.

### *Challenges for Cause*

Defendant argues that the trial court erred when, during *voir dire*, it denied his challenges for cause as he sought to exclude two prospective members of the jury venire, Mr. Jolet and Mr. Lagman.

Louisiana Code of Criminal Procedure Article 799 provides:

> In trials of offenses punishable by death or necessarily by imprisonment at hard labor, each defendant shall have twelve peremptory challenges, and the state twelve for each defendant. In all other cases, each defendant shall have six peremptory challenges, and the state six for each defendant.

In *State v. Scott,* 04-1312, pp. 16-17 (La. 1/19/06), 921 So.2d 904, 921, *cert. denied*, 549 U.S. 858, 127 S.Ct. 137 (2006), *overruled on other grounds by State v. Dunn,* 07-878 (La. 1/25/08), 974 So.2d 658, the supreme court discussed the trial court's role in determining whether a prospective juror should be excused for cause from the jury panel, as follows:

> A trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the *voir dire* record as a whole reveals an abuse of discretion. *State v. Cross*, 93-1189, p. 7 (La.6/30/95), 658 So.2d 683, 686; *State v. Robertson*, 92-2660, p. 4 (La.1/14/94), 630 So.2d 1278, 1281. Prejudice is presumed when a challenge for cause is denied erroneously by a trial court and the defendant ultimately exhausts his peremptory challenges. *Robertson,* 92-2660 at p. 3, 630 So.2d at 1280; *State v. Ross*, 623 So.2d 643, 644 (La.1993). An erroneous ruling depriving an accused of a peremptory challenge is a substantial violation of his constitutional and statutory rights and constitutes reversible error. *Cross*, 93-1189 at p. 6, 658 So.2d at 686; *State v. Bourque*, 622 So.2d 198, 225 (La.1993). "A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." *State v. Jones*, 474 So.2d 919, 926 (La.1985). However, a trial court does not abuse its discretion when it refuses to excuse a prospective juror on the ground he is not impartial where, after further inquiry or instruction, the potential juror has demonstrated a willingness and ability to decide the case impartially according to the law and evidence. *Robertson,* 92-2660 at p. 4, 630 So.2d at 1281.

> To prove there has been error warranting reversal of a conviction, defendant is only required to show: (1) the erroneous denial of a challenge for cause; and (2) the use of all his peremptory challenges. *Robertson,* 92-2660 at p. 3, 630 So.2d at 1281.

Here, Defendant does not argue in brief that he had exhausted all of his peremptory challenges. The record indicates that Mr. Jolet was his tenth peremptory challenge. Thereafter, the twelve jurors were selected for the panel. While the trial court did deny Defendant's challenge for cause of the prospective juror, Mr. Lagman, the selection process never reached a point where the decision to use a peremptory challenge to excuse him was necessary as the twelve jurors were already selected. Thus, because Defendant failed to show he exhausted all of his peremptory challenges, there is no merit to this assignment of error.

## DECREE

The evidence was sufficient to convict Defendant of the offense of second degree murder of his infant son. There was no error when the trial court allowed Defendant to withdraw the erroneously filed motion for a sanity commission. Defendant was not entitled to a unanimous jury in this case. Finally, Defendant's constitutional right to a tried by an impartial and competent jury was not violated when the trial court denied Defendant's challenge for cause of two prospective jurors. Accordingly, Defendant's conviction and sentence are affirmed.

The trial court is directed to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of the opinion and to file written proof in the record that Defendant received the notice.

**AFFIRMED; REMANDED WITH INSTRUCTIONS.**